STATE EX REL. BROOKS, APPELLANT, v. FRANSHAM, . RESPONDENT.

[Submitted February 23, 1897. Decided March 8, 1897.]

*Contested Election—Remedies—Statutory Construction—Ballots—Nomination by Individuals Under Party Names.*

CONTESTED ELECTION—*Remedies.*—Where the same legislature gives two remedies for the enforcement of a right, effect should be given to each statute.
SAME.—Accordingly, *held,* that in this state a person claiming to have been elected to an office, may bring a proceeding under section 2010 in the nature of *quo warranto,* although section 1414 same Code gives another remedy for a trial of the same question.
BALLOTS—*Nominations by Individuals.*—Where a political party is regularly organized and has a party name, candidates nominated by petition of electors belonging to that party are not entitled to be placed on the ballot under the name of that party; party nominations cannot be made by petition.
SAME.—Under section 1351, 1354 and 1356 of the Political Code, the ballots are prepared and provided by the respective county clerks; and it is the duty of the clerk to publish in one or more newspapers the nominations. at least ten days before the election (Section 1318, Political Code); *held,* that the object of this publicatic n is to afford opportunity to correct errors and omissions before elections. (§ 1322 of the Political Code.)
SAME.—*Held,* accordingly, that unless the corrections are made before the election, the ballots cannot be rejected because the nominations were not properly made.
SAME.—The fact that the district judge of the county was also a candidate for re-election and thus disqualified, does not change the rule; application could be made to any other district judge.
BALLOTS—*Marking.*—The laws of this state permit an elector to vote a straight party ticket by marking a cross at the head of his party, or he may mark a cross opposite the name of every candidate on the list; if he desires to vot for a candidate or candidates on another list, then he must make a cross opposite the name for every candidate for whom he desires to vote. *Held,* that. where there are two candidates for the same office, ballots which are marked with the cross at the head of the list containing the name of one of the candidates, and with a cross opposite the name of the other, cannot be counted for either, as it is impossible to ascertain the intent of the voter.

*Appeal from District Court, Gallatin County. F. K. Armstrong, Judge.*

· QUO WARRANTO on the relation of W. Randolph Brooks to determine the right of William J. Fransham to the office of sheriff of Gallatin county. From a judgment in favor of defendant, relator appeals. Reversed. '

*T. J. Walsh,* for Appellant.

The elector's nomination was utterly void. (*State* v. *Rot-witt*, 46 Pac. 370; *State* v. *Reek*, 46 Pac. 438; *State* v. *Tooker*, 46 Pac. 530.) Upon the second ground of contest, namely: the error in counting for defendant, ballots marked with a cross at the top of the democratic column, and also opposite his name, we submit without additional comment the following authorities : · (*Vallier* v. *Brakke*, 64 N. W. 180; *McKittrick* v. *Pardee*, 65 N. W. 23; *Curran* v. *Clayton*, 29 Atl. 930; *Heiskell* v. *Landrum*, 46 Pac. 120; *People* v. *Seaman*, 5 Denio, 409; *Newton* v. *Newell*, 6 N. W. 346; *People* v. *Cicott*, 16 Mich. 306.)

*Luce & Luce*, for Respondent.

Where authority is given to do a particular thing and the mode of doing it is proscribed, it is limited to be done in that mode; all other modes are excluded. (Sutherland on Statutory Construction, §§ 326-327; *Thurston* v. *Prentiss*, 1 Mich. 193 ) Specific provisions relating to a particular subject must govern in respect to that subject, as against general provisions in other parts of the law which might otherwise be broad enough to include it. (*Pell* v. *Pell*, 19 Wis. 196; *Smith* v. *Stevens*, 10 Wal. 321; citing also *Gorham* v. *Luckett*, 6 B. Mon. 146; § 1410-1414, Code of Civil Procedure; *Ames* v. *Kansas*, 111 U. S. 449; *Foster* v. *Kansas*, 112 U. S. 201; *Attorney General* v. *Sullivan*, 28 L. R. A. 455; *State* v. *Marlow*, 15 Ohio St. 114, opinion 134; *Smith* v. *Lockwood*, 13 Barb. 209; *Dudley* v. *Mayhew*, 3 N. Y. 9; Sedgwick on Construction of Statute and Constitutional Law, 94; Cooley on Constitutional Limitation, 133, see also 207-208-209; *People* v. *Mahaney*, 13 Mich. 481; *Peabody* v. *School Committee*, 115 Mass. 383.) This action is not prosecuted by the attorney general or by his authority, nor is it presumed to be an action brought by the people of the state of Montana for an alleged usurpation, but is brought distinctly under the provisions of section 1414, Code of Civil Procedure to determine a private right.

By section 1410, Code of Civil Procedure, the action is

made a civil action, and section 1414 makes it incumbent upon the person desiring to bring *quo warranto* where he claims to be entitled to a public office unlawfully held and exercised by another, to file an undertaking to pay any judgment for costs or damages recovered against *him*, and all costs and expenses incurred in the prosecution of the action. Nothing is better settled than that the extraordinary remedies of injunction, *mandamus* and *quo warranto* are not grantable where the party aggrieved can obtain full and adequate relief in the usual course of proceedings at law, or by the ordinary forms of civil actions, or by a specific mode provided by statute. (High on Extraordinary Legal Remedies, §§ 617, 618, 637, 645; *People ex rel. Lord* v. *Every*, 38 Mich. 405; *State* v. *Wilson*, 2 Pac. 828, opinion 836, and cases there cited; *People* v. *Hillsdale, Etc. Turnpike Co.*, 2 Johns, 190.) Counsel cited the following cases on other questions: *State* v. *Burdicks*, 46 Pac. 854; *People* v. *District Court*, 18 Col. 26, 31 Pac. 339; *Simpson* v. *Osborn*, 52 Kan. 328, 34 Pac. 747; *Manston* v. *McIntosh*, 60 N. W. 672; *Phelps* v. *Piper*, 67 N. W. 755; *State* v. *Johnson*, 46 Pac. 440; *Shields* v. *Jacob*, 88 Mich. 164, 50 N. W. 105; *State* v. *Benton*, 13 Mont. 306, 34 Pac. 301; *Stackpole* v. *Hallahan*, 16 Mont. 40; *Kirk* v. *Rhoads*, 46 Cal. 404; *Gumm* v. *Hubbard*, 97 Mo. 311, 11 S. W. 61; *Allen* v. *Glynn*, 29 Pac. 670-673; *Bowers* v. *Smith*, 17 S. W. 761; *Miller* v. *Pennoyer*, 31 Pac. 830-831.

HUNT, J.—This is an appeal from a judgment of the district court of Gallatin county adjudging that the relator take nothing by reason of his action, and that the respondent recover his costs. The complaint alleges that the relator, Brooks, at the general election in November, 1896, was the Democratic candidate for sheriff of Gallatin county, and that the defendant, Fransham, was the Republican candidate, having been regularly nominated by the Republican county convention of Gallatin county. Relator further alleges that on November 11, 1896, the board of canvassers of Gallatin county declared and certified that Fransham had received 1,080 votes

for sheriff, and that Brooks had received 1,034 votes, where-
upon Fransham was declared elected and a certificate issued to
him.    Relator, Brooks, then avers that the Silver Republican
party has existed in Montana at all times since September 9,
1896, and by its convention had nominated candidates for elec-
tors for president and vice president of the United States, for
representative in congress, and various state officers for the
state of Montana, and had published its principles, but that no
convention of said party was ever held in Gallatin county to
nominate candidates for county offices or for any purpose.    It
is also alleged that the principles advocated by the Silver Re-
publican party were much more popular in Gallatin county
than the principles of the Republican party, and that subse-
quent to the adjournment of the Republican county conven-
tion for Gallatin county the various candidates of the Repub-
lican party for the various county offices to avail themselves of
the advantages arising from the popularity of the Silver Re-
publican party, ''and with the view to represent themselves
and have themselves represented to the electors of the said
county of Gallatin as the candidates of the said Silver Repub-
lican party, caused to be circulated among the electors of the
the said county of Gallatin certain lists, headed with a recital,
in substance, to the effect that the said individuals so thereto-
fore nominated by the county convention of the Republican
party of the said county of Gallatin were thereby, by the elec-
tors signing the same lists, nominated as the candidates of the
said Silver Republican party for members of the state legisla-
ture and the various county offices, each individual so nomi-
nated being nominated for the same office for which he had
been theretofore nominated by the said Republican convention;
that the said lists so circulated were signed by the number of
electors of said county requisite to make nominations for the
said offices by electors acting independently of the convention,
and that, having been so signed, the said lists were as one
document filed in the office of the county recorder of the said
county of Gallatin; and that relator avers that, save and ex-
cept as aforesaid, none of the said individuals, nor any other

person, was ever nominated by the said Silver Republican party as candidate for any county office for the said county of Gallatin.'' And relator further avers that immediately prior to October 23, 1896, the supreme court of the state had pending before it several cases, in which the validity of other nominations made in other counties of the state as the candidates of the Silver Republican party for county and district offices was challenged, which said nominations were made in the same manner as just set forth concerning the alleged nomination of candidates of said Silver Republican party for county offices in Gallatin county; that is, by the independent action of electors signing lists headed with a recital, in substance to the effect that they thereby nominated certain persons named as the candidates of the Silver Republican party. It is averred that on October 23, 1896, the supreme court of this state handed down its decisions affecting nominations attempted to be made in the manner hereinbefore set forth, and that thereupon the county attorney of Gallatin county advised the county clerk of that county of the decisions of the supreme court, and that the lists filed with him were invalid as nomination certificates, and that the candidates therein named were not entitled to appear upon the official ballot of Gallatin county, except as candidates of the Republican party, and that he should not print the ballots with the names of any persons thereon as the candidates of the Silver Republican party for county offices of said county; that thereupon, on October 23, 1896, the county clerk declared to relator his intention to print and circulate the official ballots for the ensuing election, to be held on November 3, 1896, with no names appearing thereon under the heading of the Silver Republican party, or with the group of candidates of said party, except those of such persons as had been nominated by it for presidential electors, representative in congress, and state officers. The relator avers that in accordance with the advice of the county attorney the county clerk caused to be printed on October 23d a large number of sample official ballots for said county, on which there appeared no names of candidates of the Silver Re-

publican party except for electors for president and vice president, member of congress and state officers; but that, disregarding the advice so given, the county clerk later on the same day, at the instigation of said alleged nominees of the Silver Republican party for county offices, ceased to print the ballots in form as aforesaid, and caused to be printed, and thereafter to be distributed among the various precincts of the county, official ballots on which all of the candidates of said Republican party appeared under the head of the Republican party, and also under the heading of the Silver Republican party, and that such ballots, and no others, were used at all of the precincts of Gallatin county. The relator avers that one W. L. Holloway appeared as the Republican candidate for judge of the Ninth judicial district, and that one F. K. Armstrong was at the time judge of said district court, and was also at that time the Democratic candidate for re-election; that Holloway's name appeared in the lists hereinbefore referred to, purporting to have been nominated as the candidate of the Silver Republican party for judge, and that his name appeared upon said official ballots under the heading of the Silver Republican party, by reason of which facts the said F. K. Armstrong was disqualified from hearing any proceedings that might have been brought to obtain redress for the unlawful acts of the county clerk in printing and distributing the said ballots; that the relator and others, who were candidates of the Democratic party, on learning on October 23, 1896, of the purpose of the county clerk in the matter of printing the official ballots of Gallatin county intended to apply to the supreme court to have the county clerk enjoined from printing or distributing any official ballots for Gallatin county with any names appearing thereon as the candidates of the Silver Republican party for county offices for Gallatin county, when they learned the fact that the supreme court had declared on that day that it would hear no more cases touching the validity of nominations or regularity of ballots for the ensuing election. The relator then avers that at the election more than 200 ballots were cast in the various precincts of Gallatin

county in which the voter designated his choice of candidates by marking a cross in the circle at the head of the group of candidates of the Silver Republican party, and not otherwise, and that each of said ballots so cast was counted and returned by the election officers as a vote for Fransham for sheriff; that if 47 or more of said ballots, marked as aforesaid, had not been counted for Fransham, the relator would have received a greater number of votes than Fransham, and would have been elected. The relator makes a further complaint, averring that in the precinct of South Bozeman at least 30, and at the precinct of Chestnut at least 20, ballots were cast in which the voters marked a cross within the circle at the head of the list or column headed ''Democratic party,'' and also placed a cross at the left of the name of said Fransham where it appeared in the list headed ''Silver Republican Party,'' and that all of the ballots so cast were by the judges and clerks of election of said precincts returned as votes for the said Fransham for sheriff and were included in the number of votes so found to have been received by Fransham by the board of county canvassers. The relator then alleges that the defendant usurped the office of sheriff of Gallatin county, and he demands judgment against said defendant and in favor of his own right. To this complaint the defendant demurred generally and specially. The district court sustained the demurrer. The relator declined to amend his complaint, and permitted judgment to go against him.

A question of jurisdiction is raised *in limine* by the contention of defendant that this action cannot be maintained at all as one in the nature of *quo warranto*, and that it was not instituted within the time allowed by law for contesting an election for a county office,.and that, therefore, the lower court had no jurisdiction of the subject-matter. By section 2010 *et seq.*, Code of Civil Procedure, any elector may contest the right of any person, declared to be elected to an office to be exercised in a county, town or city, for any of four grounds, one of which is on account of illegal votes. It is further provided by section 2015 that, when the reception of illegal votes

is alleged as a cause of contest, the party contesting such election must deliver to the opposite party, at least three days before such trial, a written list of the number of illegal votes, and by whom given, which he intends to prove on the trial, and no testimony can be received of any illegal votes, except such as are specified in such list. It would seem, therefore, as if by the use of the words "illegal votes" in a proceeding to contest an election, under the statutes cited, the legislature meant votes cast by persons disqualified as electors under the constitution and laws of the state, and that no reference was intended to contests over the proper method of counting votes confessedly cast by qualified voters. But, if our construction of the statute on this point is too narrow, we still find that by the later and better-considered authorities the relator herein should not be denied the right to maintain this action in the name of the state, under section 1414 of the Code of Civil Procedure, wherein it is provided that "a person claiming to be entitled to a public office, unlawfully held and exercised by another, by himself or by an attorney and counselor at law, may bring an action therefor in the name of the state as provided in this chapter," etc. Concerning the right to institute a proceeding in the nature of *quo warranto*, where there exists a statutory method for testing the results of an election, Spelling, in his work on Extraordinary Relief (section 1776), says: "Upon the question whether the existence of a statutory method for testing the results of an election will constitute a bar to the proceeding, the authorities are not altogether harmonious; but nearly all the recent authorities are to the effect that such statutory remedy does not exclude the remedy by *quo warranto* to try title." McCrary on Elections (section 395) has the following: "A statute which confers upon any elector of the proper county the right to contest, at his option, the election of any person who has been declared to be duly elected to a public office, to be exercised in and for such county, does not oust the jurisdiction of the proper court, on information in the nature of a *quo warranto*, to inquire into the authority of any person who assumes to exercise the functions

of a public office or franchise, and to remove him therefrom if he be a usurper, having no legal right thereto.'' In *State* v. *Adams*, 65 Ind. 393, it was insisted by the appellee that the court had no original jurisdiction over the subject-matter of the suit by information for a writ of mandate, because the relator had an adequate legal remedy under an act of that state for contesting elections. The code of Indiana enacted that ''when any person shall usurp, intrude into, or unlawfully hold or exercise any public office, or any franchise within this state, or any office in any corporation created by the authority of this state,'' an information might be filed against any person or corporation by the prosecuting attorney, ''or by any other person on his own · relation, whenever he claims an interest in the office, franchise or corporation which is the subject of the information.'' The court said it was clear to them that the relator might seek the remedy he asked under the statute, and that while it was also clear, as a general principle, that a party is not entitled to a writ of mandate when he has any other adequate legal remedy, ''yet, where the statute expressly gives the right by information, we do not think another statute giving another adequate legal remedy will take away the right given by information.'' Paine on Elections (section 861), citing the Indiana cases, says : ''Nor will the adoption of a special statutory proceeding for the trial of cases of contested elections, in the absence of express provision to that effect, abrogate the right to a trial upon an information in the nature of a *quo warranto*, secured by an unrepealed statute of the same date with that which establishes the statutory proceeding.'' (*People* v. *Londoner* (Col. Sup.) 22 Pac. 764.) In *State* v. *Frazier* (Neb.) 44 N. W. 471, the relator therein brought his original petition in *quo warranto* against one Frazier, of Dakota county, alleging substantially that at an election held relator received a majority of all legal votes cast at said election, and was duly elected to the office of county attorney, but that the defendant refused to deliver possession of the office to relator. The respondent in that case raised the point that the relator· should be denied his remedy

by *quo warranto* because he had an adequate remedy at law, pursuant to certain statutes of Nebraska providing for contesting elections.    Justice Cobb discusses with much learning the argument of respondent, and thus regards it :    "The statute nowhere in terms makes these provisions exclusive of all other remedies; so that if they are to be so considered it must be by force of that general proposition so often invoked, and laid down with more or less accuracy, that neither injunction in equity, nor *mandamus* at law, can be resorted to where the party aggrieved can obtain full and adequate relief in the usual course of proceedings at law or by the ordinary forms of civil action.    Mr. High, in his work on Extraordinary Legal Remedies, at section 617, says that 'a striking analogy exists between the remedy by *quo warranto*, information and the extraordinary remedies' above referred to.    He also lays down the rule that 'where a specific mode is provided by statute,   *   *   *   and a specific tribunal is created for that purpose, and the method of proceeding therein is fixed by law, resort must be had to the remedy thus provided, and proceedings by information in the nature of a *quo warranto* will not be entertained.' (*Id.*)    The author cites to the above :   *State* v. *Marlow*, 15 Ohio St. 114; *State* v. *Taylor*, *Id.* 137; *Com.* v. *Henszey*, 81 Pa. St. 101; *People* v. *Every*, 38 Mich. 405; *State* v. *Wadkins*, 1 Rich. Law 42; *People* v. *Whitcomb*, 55 Ill. 172; *People* v. *Ridgley*, 21 Ill. 66; *Dart* v. *Houston*, 22 Ga. 506; *People* v. *Turnpike Co.*, 2 Johns, 190.    I have examined all the above cases except *People* v. *Whitcomb*, 55 Ill. 172, which I do not find in the library, and do not find any one of them to sustain the text, with the exception of *State* v. *Marlow*, 15 Ohio St. 114, which is the case discussed by Chief Justice Lake in *Kane* v. *People*, 4 Neb. 509.    I am, therefore, of the opinion that the remedy by contest, under the provisions of the statute above cited, in cases like the one at bar, is a cumulative, and not an exclusive one, and that the objections to the procedure by *quo warranto*, and to the jurisdiction of this court to hear and determine it, must be overruled."    If the learned judge had been able to read the opinion in *People* v.

*Whitcomb*, 55 Ill. 172,—not accessible to him,—he would have included it in the statement that the cases cited by High in the first edition of his book on Extraordinary Legal Remedies (section 617) do not warrant his text. In the last or third edition the learned author reverses the views he held in the first edition, which must have been the book referred to by Justice Cobb, for he expressly writes that the better considered doctrine is that the existence of a statutory remedy does not oust the jurisdiction of courts by *quo warranto* or prevent the people from resorting to this remedy to determine questions of usurpation to public office.

In *People* v. *Holden*, 28 Cal. 124, Sanderson, C. J., for the court, held that the act providing a mode for contesting elections conferred upon any elector of the proper county the right to contest the election of any person who had been declared duly elected to a public office to be exercised in and for such county; but that this grant of power to the elector could in no way impair the right of the people in their sovereign capacity to inquire into the authority by which any person assumed to exercise the functions of a public office, and to remove him therefrom if it was made to appear that he was a usurper and without legal right thereto. The court then speaks of the remedies by information in the nature of a *quo warranto* as a power granted to the people in the right of their sovereignty. But it is to be observed that under section 1414 of the Montana Code of Civil Procedure exactly the same power is given to a person claiming to be entitled to a public office unlawfully held by another, to bring an action in the name of the state, as is given to the attorney general. So that all that the California court said sustains the proposition that the contested election statute and the remedy by *quo warranto* remain as concurrent remedies. In the recent case of *Snowball* v. *People*, 147 Ill. 260, 35 N. E. 538, a *quo warranto* proceeding was had to try the title of appellant to the office of a member of the board of education of a county. It was there also contended that the proceeding was merely an election contest, and that such contests could only be determined by the county

court, and not by the circuit court, in a *quo warranto* proceeding. The court said : "There seems to be some disagreement among the authorities upon the question whether proings by information in the nature of *quo warranto* are excluded, where a statute prescribes a specific mode for contesting elections, and designates a particular tribunal for determining such contests. It has been held in Ohio and Pennsylvania, and perhaps in some other states, that, where a specific mode of contesting elections has been provided by statute, that mode alone can be resorted to, and that the common-law mode of inquiry by proceedings in *quo warranto* will not be entertained. (*State* v. *Marlow*, 15 Ohio St. 114; *Com.* v. *Leech*, 44 Pa. St. 332; High on Extraordinary Legal Remedies, § 617.) It will be found upon examination, that the decisions, which thus hold, are based upon peculiar statutory and constitutional provisions, which do not exist in this state. (*People* v. *Hall*, 80 N. Y. 117.) But, independently of such provisions, the weight of authority is in favor of the position, that the special remedy given by statute in such cases is merely cumulative, and not exclusive, of the remedy by *quo warranto*. The general principle is that, in the absence of any controlling constitutional restrictions upon the subject, the jurisdiction of the courts to proceed by information in the nature of *quo warranto* is not taken away by a statute which prescribes a special proceeding, unless there are express words in the statute itself taking away such jurisdiction, or unless it appears to have been the manifest intention of the legislature to confine the remedy to the prescribed proceeding and to the designated tribunal. (1 Dillon on Mun. Corp. (4th Ed.) § 202 (old § 141) and notes.)" See, also *State* v. *Gallagher*, 81 Ind. 558, and *State* v. *Meilike* (Wis.) 51 N. W. 875. The case of *Gillespie* v. *Dion*, 18 Mont. 183, 44 Pac. 954, was an election contest instituted specially under the Compiled Statutes of 1887, and before the adoption of the Codes of 1895. It was not contended in that case that the action was one brought in the nature of a *quo warranto* proceeding, and questions herein raised were not involved in that case and were not considered by the

court.   We think, therefore, that where the two sections providing for contesting the right of a person to hold an office were passed at the same session of the legislature, effect should be given to each, if possible, and that the proper construction of the statutes heretofore referred to is that the remedy of *quo warranto* is concurrent with the right to institute an election contest.

The case for consideration on its merits stands as one of conceded facts.   The Silver Republican party was at the election of 1896 in Montana an existing political organization within the state, and within many of the counties of the state.   Just prior to its independent existence as a political party its members affiliated with the Republican party, and agreed in convention of the Republican party upon the same state ticket ; but immediately thereafter, in the exercise of its independent political rights, it made its own nominations for presidential electors, and effected an organization.   It also nominated local candidates for office in various counties of the state.   But in Gallatin county, as a party, the Silver Republicans did not regularly, in convention or otherwise, nominate local candidates. A number of individual electors of that county did, however, attempt to nominate as the candidates of the Silver Republican party for local offices the same persons as the Republican party had previously nominated as its candidates for such offices. These attempted nominations having been by petition, wherein individual electors sought to make the persons named the candidates of the party whose name they used in the petition of nomination, were invalid and worthless as party nominations. We have already decided in the cases of *State* v. *Rotwitt*, 18 Mont. 502, 46 Pac. 370, *State* v. *Tooker*, 18 Mont. 540, 46 Pac. 530, and *State* v. *Reek*, 18 Mont. 557, 46 Pac. 438, that the statutes do not permit a nomination of a person as the candidate of a regularly existing political party to be made by petition of unorganized electors, and, furthermore, that a candidate, certified as nominated by electors, is not nominated by a political party, and has no right to be placed on the official

ballot as the candidate of an organized existing party. These decisions were made after careful consideration of our statutes, and must stand. It was therefore the duty of the county clerk of Gallatin county to omit from the Silver Republican column of the official ballot the names of all persons so attempted to be nominated by electors as the candidates of that party for local offices. But the clerk failed to do his duty, and without authority inserted and published in the official ballot the relator's and other persons' names as candidates for local offices in the Silver Republican column, beneath the names of those candidates for state offices who had been regularly nominated in state convention by the Silver Republican party. The case comes, then, to this: What is the effect of the unauthorized conduct of the county clerk upon the votes cast for the candidate for sheriff by the marking of the ballots within the circle under the caption of the Silver Republican column?

No embarrassment confronts us by reason of the alleged lack of qualification of the voters who voted the ballots presented; nor is the case complicated by any contention on the relator's part that the ballots which were marked were not official ballots,—that is, printed ballots prepared and provided by the county clerk, whose duty it was under sections 1351, 1354, 1356 of the Political Code, to cause the ballots to be printed and delivered to the judges of election. Section 1318 of the Political Code requires the county clerk, at least 10 days before an election is held, to publish in one or more newspapers within the county the nominations to office, certified to him as required by law. The object of this requirement is to authoritatively present to the electors an accurate list of names of the persons who have been duly nominated for offices to be filled by the voters; and, in the absence of any averment in the complaint to the contrary, we will assume that the ballots printed and delivered by the county clerk to the judges of election, and voted by the electors, were the same, in substance and arrangement of columns, and contained the same statement of names of candidates, together with the

principles or parties represented by such candidates, as were included in the published list of nominations made 10 days before election, as required by the above referred to provisions of the law.    So we must conclude that the form of the ballot was regular on its face.    It was apparently the ballot made up exactly as the statute required it should be made up.    Now, when a voter called for a ballot, the judges gave such a ballot to him, marked as required by law (section 1360 of the Political Code), with the designation ''Official Ballot'' stamped thereon.    The voter, by an examination of the ballot so given to him, was entirely unable to tell that the Silver Republican candidates for local offices never had been legally nominated as the candidates of that party; nor was it patent that the county clerk of Gallatin county, in making up the official ballot, had not done his duty by inserting the names of any candidates not nominated according to law.    (Political Code, § 1354.)    The error in them could not be discerned on inspection; it was latent.    The ballot was the only one authorized to be handed to a voter, and to be used by him.    He could mark and return no other without violating the law.    The voters were innocent and honest in their acts.    These propositions are indisputable.

But relator now asks the court to throw out the votes of 200 qualified voters, who honestly used ballots furnished for their use by the authorities of the county, because the county clerk violated his duty by putting the names of candidates who were not legally nominated by the Silver Republican party in the party column of that party.    This is a request to have 200 legal votes rejected.    He raises no question of the intent of these 200 voters, or of their methods of voting, but relies upon the argument that the county clerk's violation of the law made the official ballot a falsehood, and by the use of the ballot presented the voter was led to vote for a candidate upon the representation that he was the candidate of the party under the title of which his name appeared, when in fact he was not such candidate.    Let us grant that this is true; yet it cannot avail the relator in this case.    It must always be remembered

that the publication of the nominations for 10 days prior to the election was an official announcement to the electors as a fact that defendant was the candidate of the Silver Republican party, and was duly nominated by that party for the office of sheriff, and would be on the official ballot as the Silver Republican candidate, unless, of course, it might after publication be otherwise ordered by the courts. Furthermore, the announcement was made in order that any errors or omissions in the publication of the names or descriptions of the candidates nominated for office, or in the printing of the ballots, might, upon application of any elector to the district court, be corrected, or cause shown for not making the correction. (Political Code, § 1322.) The last-cited statute contemplates and authorizes the institution of proceedings to cure, not alone clerical omissions or errors, but likewise extends to instances of defects by way of omission of names of candidates from the ballot, as well as to erroneous insertions of names of persons as candidates who are not in fact entitled to be so regarded, and whose names, unless stricken off the official ballot, will be erroneously printed thereon.

It is well known that the interests of candidates of parties are generally managed and jealously guarded by committees located at central points, and whose duties are to vigilantly protect their candidates against possible prejudice or error on the part of all persons, officially or otherwise, taking necessary or important or active part in connection with election affairs. Candidates, too, are usually alert to protest against any infringement of the law whereby they may be put to disadvantage. In order to give to them, as well as to all others, the clearest understanding of what ballot is to be given to the judges of election for electors by the county clerk, the law has imposed upon that official the duty of making proper publication, and simultaneously accorded to any elector a correlatively important right of calling upon the courts to compel the legal and proper performance of his duty. But, where there is a neglect on the part of one to avail himself of this right, he cannot, when the result of the election is announced

and he finds himself defeated at the polls, ask the courts to nullify the expressed will of voters upon the ground of the error or wrong of the county clerk, which he could by reasonable diligence have had corrected by invoking the statutory provisions at the proper time.  As said by Andrews, C. J., in the case of *People* v. *Wood* (N. Y. App.) 42 N. E. 536 : "We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake or even wilful misconduct of election officers in performing the duty cast upon them."  Or it might be put in this way : If no ante-election objection to a nomination is made, the provisions of the statute are to be treated as directory.  This principle, although apparently departed from in *Price* v. *Lush*, 10 Mont. 61, 24 Pac. 749, was none the less the underlying one of the late decision in *Stackpole* v. *Hallahan* (Mont.) 40 Pac. 80, and is the basis of other numerous late and well-considered opinions (*Bowers* v. *Smith* (Mo. Sup.) 20 S. W. 101; *Allen* v. *Glynn* (Col. Sup., 1892) 29 Pac. 670; *Miller* v. *Pennoyer* (Or., 1893) 31 Pac. 830; *Brangdon* v. *Navarre* (Mich., 1894) 60 N. W. 277), and the two opinions rendered during the same week in December, 1895, by the courts of Idaho and New York, respectively. (*Baker* v. *Scott*, 43 Pac. 76; *People* v. *Wood, supra.*)  In considering this case we acknowledge great aid from the last case cited.

Possibly a case might be conceived of where the official ballot given to the voter was not the one published at all by the county clerk; as, for instance, where the county clerk delivered to the judges at the last moment ballots containing different names from those published as the candidates nominated and where the misconduct was such that by no possible reasonable effort could it have been prevented, because of the deception and misconduct of the officer.  It might be that under such circumstances the rule should be relaxed because of the possible inapplicability of the general principle stated; but no such case is presented here, and, even if there were, it is difficult to see how, under the constitution of our state (section 13, article 9), the person who receives the highest number of

votes cast by qualified voters·can be denied the constitutional right to the office to which he has been so elected. There is wisdom in that construction of election laws which holds rigidly to the doctrine that in our country, where the will of the people is supreme, when clearly expressed it cannot be defeated by a claim that an official neglected to properly make up the ballot published and voted. A party or candidate may be defeated by an official's wrong, but the electors must be secure in the knowledge that their votes, when legally cast will be counted. And we cannot hold to the contrary, unless compelled to do so by mandatory provisions of law and construction requiring such votes to be held void, not in our constitution or codes. The argument that the ballot was a falsehood, and that no person should profit by it, has considerable force, we admit; but it is not strong enough, under the facts admitted by the demurrer to the complaint herein, to outweigh the more important controlling principle that the electors, who do not make up the ballot, must rely with perfect assurance and safety upon the official ballots given them, and that their ballots will be counted as marked, and that their legally expressed will cannot be overthrown where they are not at fault, although it should turn out that the public officer who had to do with the preparing of the ballot voted may have neglected his duty.

The relator's complaint is wholly insufficient in its averment of fact to warrant us in concluding that the defendant instigated the county clerk to commit the error or wrong of publishing the Silver Republican candidates' names in the manner he did, or that the clerk did so with the actual knowledge and consent of the defendant. We, therefore, find it unnecessary to construe any possible effect upon the result of the election that sections 60, 103, 111, Corrupt Practice Act (Penal Code), may have.

We think, too, that the excuses offered by the relator for lying by and waiting until election was over are too trivial for serious consideration. If Judge Armstrong was a candidate, and thus disqualified from issuing orders in the premises, re-

lator could easily have gone to another district judge, and obtained an order of correction or to show cause. He does not pretend that he made any real effort to cure the error.

These views dispose of the first branch of the case, and lead to our approval of the ruling of the district court thereon.

The second ground of contest raises this question : How should a ballot be counted where, as is shown by the illustration below, a voter marked a cross within the circle at the head of the column marked ''Democratic Party,'' and also placed a cross at the left of the name of defendant where it appeared in the column headed ''Silver Republican party ? ''

| | Democratic Party. | | Silver Republican Party. |
|---|---|---|---|
| | ⊗ | | ◯ |
| | For Governor, Robert B. Smith. | | For Governor, Alex. C. Botkin. |
| | For Sheriff of Gallatin County, W. Randolph Brooks. | X | For Sheriff of Gallatin County, William J. Fransham. |

This feature of the case becomes material, for the reason that relator alleges that at least 50 ballots so marked were counted and returned as votes for Fransham, and were counted and included in the sum total of his 1,080 votes. Inasmuch as relator received 1,034 votes, it follows that if Fransham was allowed 50 votes not legally cast for him it would reduce his votes to 1,030, or four less than the relator received. The learned district judge was of the opinion that the defendant was properly credited with votes marked for him as above indicated, construing the intention of the voter who so marked

his ballot to be to vote for all the Democratic candidates except for sheriff, and for that office he voted for defendant, the Silver Republican candidate. This construction was founded upon section 1403 of the Political Code, which is fully quoted and discussed in *Dickerman* v. *Gelsthorpe* 19 Mont. 249, 47 Pac. 999. In that case we held that section 1403 was intended to modify sections 1354 and 1361 of the Political Code, and that they must be construed together. It was further decided, as applied to the ballot just illustrated, that marking in the circle at the head of the Democratic list is, under the law,—so far as the legal intent of the voter is concerned,—equivalent to placing a cross opposite the name of each and every candidate in the list under said circle. In other words, we think that the permission to the voter to mark in the circle at the head of the Democratic list was simply, in effect, saying to him : "You may, instead of making crosses opposite the names of each and every candidate on this list, make one cross in the circle at the top, and by doing so you express your intent to vote for each and every candidate of the Democratic party, just as fully and as specifically as if you marked opposite the names of each and every such one." "The legal intent," says Justice Buck in that opinion, "from the cross in the circle is not subordinate to the intent manifested by marking crosses opposite the names of particular candidates in other lists."

This being the law, therefore, we find that the averment of relator's complaint is to the effect that at least 50 voters, by marking a cross in the circle at the top of the Democratic column, expressed an intent to vote for Brooks, but by also marking a cross opposite the name of Fransham, on the Silver Republican ticket, they expressed their intent to vote for Fransham. Such a marking of the ballot renders it impossible, in our judgment, to determine whether the voters legally intended to vote for relator or for the defendant, for the mark in the circle at the top of the Democratic column, although apparently in favor of relator, was neutralized by the marks in the Silver Republican column opposite defendant's name.

The voter who so marked his ballot has really voted for two opposing candidates for the same office, and for sheriff his ballot cannot be counted at all.    If there had been no candida e in the Democratic column named for sheriff, and the cross was opposite the name of Fransham in the Silver Republican column, the facts would bring the case squarely within the Dickerman-Gelsthorpe decision; but the difference is most significant, and it is impossible to say just what the voter meant by marking his ballot as he did.    As we have said, the circle mark being of equal significance with the cross mark opposite the name, the corollary of that, and the equivalent statement that the voter has distinctly expressed his intent to vote for two men, is that, so far as that part of the ballot is involved, it becomes impossible to determine the elector's choice, and such a vote or votes must not be counted for either candidate. The sequel of what we have said is that the district court extended the rule of liberality of construction of section 1403 beyond a point where we think it can be properly applied. The court should have overruled the demurrer upon this branch of the case, and required defendant to answer the averments concerning the votes in the precincts of South Bozeman and Chestnut.    The judgment is, therefore, reversed, and the case remanded, with directions to the district court to overrule the demurrer, and require defendant to answer the averments pertaining to the South Bozeman and Chestnut voting precincts.

*Reversed and Remanded.*

BUCK, J., concurs.