NORTH, *Chairman of Board of Com'rs of Tulsa County, et al. v.* McMAHAN.

No. 1364.   Opinion Filed May 31, 1910.

(110 Pac. 1115.)

1.   **COUNTIES—Indebtedness — Referendum — Courthouse Bonds.**
Where, in an action to mandamus the board of county commissioners and the clerk of T. county to execute certain courthouse and jail bonds voted at an election held for that purpose on October 19, 1909, the record discloses that said bonds were voted to incur a county indebtedness to an amount exceeding the income and revenue provided for that year, pursuant to article 10, sec. 26, of the Constitution; that the procedure in calling and holding said election was pursuant to and in conformity with the act of March 11, 1897 (Wilson's Rev. & Ann. St. 1903, secs. 1468-1473), extended to and put in force so far as applicable and not repugnant to the Constitution, on admission of the state; that three-fifths of the voters voting at said election assented thereto—held, that said act, in so far as the same provides that said bonds shall not be issued until a "majority" of the qualified electors voting at said election shall have declared by their votes in favor of issuing such bonds, is repugnant to said article 10, sec. 26, in so far as it provides that said bonds shall not issue without the assent of "three-fifths" of said voters, and to that extent said act must fall. **Held,** further, that said act and section construed together furnish a special referendum applicable to the purpose of voting said bonds; that said proceedings pursuant thereto were not subject to the general referendum laws found in articles 5 and 18 of the Constitution, as carried into effect by the act of April

16, 1908 (Laws 1907-08, c. 44); and that said bonds are valid, and the writ should run.

2.   SAME—Bridge Bonds. Where, in an action to mandamus the board of county commissioners and the clerk of T. county to execute certain bridge bonds voted at an election held for that purpose on October 19,1909, the record discloses that said bonds were voted to incur a county indebtedness to an amount exceeding the income and revenue provided for that year, pursuant to article 10, sec 26, of the Constitution, that the procedure in calling and holding said election was pursuant to and in conformity with the act of March 19, 1909 (Laws 1909, c. 32, art. 2) sec. 3, and that the necessary three-fifths of the electors voting upon such proposition assented to said bond issue, held, that said act and said section construed together furnish a special referendum applicable to the purpose of voting said bonds; that said proceedings pursuant thereto were not subject to the general referendum laws found in articles 5 and 18 of the Constitution, as carried into effect by the act of April 16, 1908; and that said bonds are valid, and the writ should run.

3.   SAME—Election—Description of Bonds. Where, in an action to mandamus the board of county commissioners and the clerk of T. county to execute certain bridge bonds voted on at an election held for that purpose, pursuant to the special referendum provided by article 10. sec. 26, of the Constitution and the act of March 19, 1909, the record discloses that said commissioners, in stating "the length of time the bonds are to run," as required by section 4 of said act, proclaimed the same to be "11 to 20 years from their date," and in the ballot used "to run from 11 to 20 years from the date thereof," held, a substantial compliance with the statute and the statutory form of ballot requiring that it should therein be stated "to run ——— years from the date thereof."

4.   ELECTIONS—Ballots — Intent of Voter. The intention of the voter should be ascertained from the language of his ballot interpreted in the light of circumstances of a public nature surrounding the election, and where such intent is thus made fairly apparent, and the ballot used substantially complies with the form prescribed, the same should be made effectual.

5.   COUNTIES—Issuance of Bonds—Statutory Provisions. An act entitled "An act for the protection, validation and sale of bond issues of the state, counties, townships and municipalities of the state of Oklahoma," approved March 24, 1910 (Sess. Laws Okla. 1910, c. 94), is prospective in its terms and in no wise affects an issue of courthouse, jail, and bridge bonds voted at an election held for that purpose on October 19, 1909, pursuant to and in conformity with procedure for calling and holding said election furnished by the act of March 11, 1897, extended to

and put in force so far as applicable and not repugnant to the Constitution on admission of the state, and prepared and sold prior to its approval.

6. **COUNTIES—Issuance of Bonds—Elections — Irregularities—Notice.** Where, in a controversy arising out of a county election held for the purpose of voting courthouse and jail bonds, it is shown that the provisions in reference to notice of the date of election were substantially complied with, as required by Snyder's Comp Laws Okla. 1909, sec. 1715, and there is no averment or showing that the electors did not have actual knowledge of the election and failed to participate therein by reason thereof, said election nor the bonds issued pursuant thereto will not be set aside.

(Syllabus by the Court.)

*Error from District Court, Tulsa County; L. M. Poe, Judge.*

Mandamus by A. J. McMahan against W. L. North , Chairman of the Board of County Commissioners of Tulsa County, and others. From a judgment granting a peremptory writ, defendants bring error. Affirmed.

*M. A. Breckinridge,* County Atty., for plaintiffs in error.

*Hainer & Martin* and *A. J. McMahan,* for defendant in error. —Citing: *City of Ardmore v. State ex rel.,* 24 Okla. 862; *Long v. City of Portland* (Ore.) 98 Pac. 1111; *Carlson v. City of Helena* (Mont.) 102 Pac. 40; *State ex rel. v. Millar,* 21 Okla. 448.

TURNER, J. On August 10, 1909, on petition presented pursuant to Act March 11, 1897 (Wilson's Rev. & Ann. St. Okla. 1903, §§ 1468-1473), plaintiffs in error board of county commissioners of Tulsa county, in regular session, adopted, without the emergency clause, a resolution providing for the calling and holding of a special election on October 12, 1909, for the purpose of submitting to the qualified voters of said county the several propositions of said county expending $200,000 for the construction of a court house, and $25,000 for the purchase of a site and the construction of a jail, and issuing negotiable coupon bonds therefor in the total sum of said amounts. On September 15, 1909, said board in special session, adopted, with the emergency clause, an amended resolution changing the date of holding said election

from October 12, 1909, to October 19, 1909. Pursuant thereto said board issued a proclamation and notice for the calling of said election, which said notice was duly published in two weekly newspapers of general circulation published at Tulsa, the county seat of said county; the first publication thereof being in the issue of both papers on September 16, 1909, the last in the issue of one on October 7, 1909, and in the issue of the other on October 14, 1909, and the same being so published in said papers four and five consecutive weeks respectively. At said election, there being cast "for courthouse bonds 1,164 votes, against courthouse bonds 585 votes," and "for jail bonds 1,204 votes, against 537 votes," the same were carried, and so declared by said board.

On the same day, to wit, August 10, 1909, pursuant to an act of March 19, 1909 (Sess. Laws Okla. 1909, p. 504), plaintiffs in error, board of county commissioners of Tulsa county, in a regular session held by said board, adopted without the emergency clause, another resolution providing for the calling and holding of a special election on October 12, 1909, for the purpose of submitting to the qualified voters of said county the proposition of said county expending $75,000 for the construction of 28 bridges as a part of the public highway system in and for said county, and of issuing negotiable coupon bonds in said amount. On September 15, 1909, said board of county commissioners, in special session, adopted, with the emergency clause, an amended resolution changing the date of holding said election from October 12, 1909, to October 19, 1909. Pursuant thereto said board issued a proclamation and notice for the calling of said election, which said notice was published in a weekly newspaper published and of general circulation in said city and county for five consecutive weeks prior to the date of said election; the first publication thereof being in the issue of September 16, 1909, and the last in the issue of October 14, 1909. At said election, there being cast "for bridge bonds 1,328 votes, against bridge bonds 448 votes," the same was carried, and so declared by said board.

On November 16, 1909, said board, in special session at the

courthouse in Tulsa, adopted 'a resolution providing for the issuance of the negotiable coupon bonds of said county in the sum of the amounts voted, and provided for the levy of an annual tax sufficient to pay the interest thereon when due, and to constitute a sinking fund for the payment of the principal at maturity. Said bonds have since been sold to plaintiff, but W. L. North, as chairman of said board, and C. F. Rogers, as county clerk of said county, refused to issue the same.

From a judgment of the district court of Tulsa county rendered and entered December 21, 1909, directing a peremptory writ of mandamus to issue commanding that they forthwith execute said courthouse, jail, and bridge bonds according to the prayer of plaintiff's petition, plaintiffs in error, defendants below, prosecute this proceeding. They allege that the court erred in granting the writ, because, they say that said resolutions providing for calling and holding said election on October 12th, and those amendatory thereto changing the date of said election to October 19, 1909, did not, under section 18 of chapter 44 of the act of April 16, 1908, become operative until 30 days after their passage and approval, and for that reason all subsequent proceedings pursuant thereto are void. On the other hand, it is contended that, as this was a referendum to incur an indebtedness in excess of the current revenue, pursuant to article 10, § 26, of the Constitution, said section and the act of March 11, 1897, set forth in Wilson's Rev. & Ann. St. §§ 1468-1473, *supra,* provide a special referendum for that purpose, and that proceedings had pursuant thereto are not subject to the general referendum laws found in articles 5 and 18 of the Constitution as carried into effect by said act of April 16, 1908. This contention is correct. Contemporaneous with the admission of the state into the Union, there was, by section 2 of the Schedule, so far as applicable and not repugnant to the Constitution, extended to and put in force throughout the state said act of March 11, 1897, the express purpose of which was "to authorize counties to issue bonds for the purchase or erection of

courthouses and jails and provide for the manner of issuing and paying the same."

. Section 1468, *supra,* in effect provides that, whenever a board of county commissioners considers it to the best interest of the county to purchase or erect a courthouse or jail, they shall have power to contract therefor and issue bonds in payment thereof, provided said bonds shall not issue until the question has been first submitted to the people of the county and a majority of the qualified electors voting at any general election or special election called by said board for the purpose shall have declared by their votes in favor of issuing the same. Provided, further, that no such election shall be ordered unless a petition stating the purpose for which the bonds are to be issued and signed by at least one-sixth of the qualified electors and taxpayers, as shown by the last preceding enumeration of said county, shall have been presented to said board praying that a vote be taken for the issuing of said bonds. The next section provides that before said board shall determine to call said election they shall cause to be made upon their records a statement showing the assessed valuation of the taxable property within the county as shown by the last annual equalized assessment roll of taxable property within said county taken for the purpose of taxation and in force and effect at the time, together with all outstanding indebtedness against the county and the cash in the hands of the county treasurer for county use, with the amount of bonds proposed to be issued, provided no election can be called for, nor bonds issued in any amount which, together with other outstanding indebtedness, would exceed 4 per centum of the assessed valuation of the taxable property within said county, etc. The next section provides that said board shall give 30 days' notice of said election by publication and the substance of what said notice shall contain. The next section provides that, if a majority of the votes cast at said election be for the issuing of the bonds, said board shall proceed at once to issue the same and deliver them to the county treasurer, who shall sell them; and what they shall bring. The next section provides how said bonds shall be

made payable, how long they shall run, the denomination of each, what interest they shall draw, etc. The next section provides that the officers charged by law with levying taxes for county purposes shall annually levy an amount sufficient to pay the interest due each year on said bonds, and also at the proper time levy an amount sufficient to pay the principal as the same shall fall due.

In short, said act, construed with section 26, *supra,* provides a complete procedure for a special referendum upon this subject, which in this case has been strictly complied with, leaving nothing further to be done to insure the validity of this bond issue, which we will hold valid, the same having been carried by the assent of three-fifths of the voters voting at said election, as required by article 10, § 26, of the Constitution, and not by a majority vote of the qualified electors voting at said election, as required by said act, which is to said extent repugnant to said section, and to that extent must fall. Said section provides :

"No county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, for any purpose, to an amount exceding, in any year, the income and revenue provided for such year, without the assent of *three-fifths* of the voters thereof, voting at an election, to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness; provided, that any county, city, town, township, school district, or other political corporation, or subdivision of the state, incurring any indebtedness, requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time contracting the same."

See *Litchfield v. Ballow et al.,* 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132; *Campbell et al. v. State ex rel.,* 23 Okla. 109, 99

Pac. 778, and cases cited. We are therefore of opinion that as to the issue of courthouse and jail bonds, set forth in the petition, the peremptory writ should run.

This is also true as to the issue of bridge bonds. Providing the procedure whereby, pursuant to section 26, *supra*, the referendum may be invoked by a county when its county commissioners shall deem it advisable to incur an indebtedness in an amount exceeding in any one year its income and revenues provided for such year for the purpose of building bridges in said county and issue bonds therefor, the act of March 19, 1909, *supra*, specifically provides for a special referendum for that purpose, and proceedings had pursuant thereto are also not subject to the general referendum laws found in articles 5 and 18 as carried into effect by said act of April 16, 1908. Section 1 of said act in effect authorizes and empowers the county commissioners of any county to issue the bonds of such county for the purpose of constructing bridges. Section 2 prescribes the denomination of said bonds, provides for the place and time of payment, what interest they shall draw, and where payable, and for interest coupons to be thereto attached, and how said bonds shall be signed and attested. Said act further provides:

"Sec. 3. Before any bonds shall be issued as herein provided, the same shall be ordered by a vote of not less than three-fifths (3-5) of the electors voting upon such proposition at an election to be held for that purpose, as hereinafter provided.

"Sec. 4. When the county commissioners of any county in this state deem it advisable to issue bonds as herein provided, they shall, by proclamation, call an election therefor, setting forth the amount of bonds proposed to be issued, the rate of interest to be paid, the purpose for which the money derived from the sale of such bonds is to be used, the length of time the bonds are to run, the number and location of such bridge or bridges, the names of the judges for each voting precinct, as hereinafter provided for, and the date upon which the election will be held; such proclamation shall be signed by the chairman of the county (board) of county commissioners, attested by the county clerk, and published in a weekly newspaper published and of general

circulation in said county for four consecutive weeks prior to the date of said election. If there be no such newspaper published in said county, then said proclamation shall be posted in five of the most public places in said county at least four weeks prior to the date of said election."

It is contended that these bonds are void, in that the election proclamation and the ballot used at the election did not comply with section 4, *supra*, in that they did not state "the length of time the bonds are to run." Said election proclamation, after setting forth the time and place of the election, states that:

"It is for the purpose of submitting to the qualified electors of said county the proposition of issuing the negotiable coupon bonds of said Tulsa county, Okla., for the aggregate amount of $75,000 for the purpose of providing the necessary funds for the construction of 28 bridges as a part of the public highway system in and for said county; said bridges to be located as follows: (setting out the location of each.)   Said bonds to bear interest at the rate of 5 per centum per annum payable semiannually and shall become due and payable 11 to 20 years from their date."

Sections 5 and 6 of said act, after providing in effect for the officers of said election and the time, place, and manner of holding same and for the canvass of the vote, in section 7 provides for all necessary supplies and how they shall be furnished, and that the ballot shall be substantially in the following form:

"Shall the county commissioners issue the bonds of ——— county, in the sum of $——— to run ——— years from date thereof, bearing interest at the rate of ——— per centum per annum, payable seminannually, for the purpose of ——— bridges?

   ☐   Yes.

   ☐   No."

The ballot used in voting at the election read:

"Ballot Special Bridge Election.

"October 19th, 1909.

"Shall the county commissioners issue bonds of Tulsa county, in the sum of $75,000.00 to run from 11 to 20 years from the

date thereof, bearing interest at the rate of five per centum per annum, payable semiannually for the purpose of constructing 28 bridges?

☐  Yes.

☐  No."

Pursuant to the authority granted by the voters at the election to the commissioners, they, on November 16, 1909, passed a resolution providing for the issuance of said bridge bonds and that they should be payable serially from 11 to 20 years. It is contended that the ballot used did not sufficiently state the length of time the bonds are to run, in that it did not specify that said bonds were to be payable serially from 11 to 20 years, and for that reason these bridge bonds are void. We think the ballot used substantially complied with the form prescribed by law, and by the expression, "to run from 11 to 20 years," in effect implied that the same were to be issued payable in series from 11 to 20 years from the date thereof. A literal compliance would have read: "To run from 11 to 20 years: First series, $7,500.00, payable December 1, 1920; second series, $7,500.00 payable December 1, 1921; third series, $7,500.00, payable December 1, 1922," etc.,—all of which we think was fairly understood by the voter and would have been unnecessary prolixity and surplusage.

In *State v. Millar*, 21 Okla. 448, 96 Pac. 747, on the ballots at an election held for the purpose of voting public utility bonds, the election officers placed the squares to the left of the question to be voted on, and placed under the squares the words "Yes" and "No," instead of placing the squares under the propositions to be voted on, and placed the words "Yes" and "No" at the left of the squares, as required by Wilson's Rev. & Ann. St. 1903, § 2963. The instructions for voting printed on the ballots were:

"Those wishing to vote for the issuance of the bonds shall designate it by marking 'X' in the square above the word 'Yes,' and those wishing to vote against the issuance of the bonds shall designate it by marking 'X' in the square above the word 'No.'"

The contention was that the election was void because of the variation in the form of the ballots made by the election officers; but the court held otherwise, and cited *State ex rel. Brooks v. Fransham,* 19 Mont. 273, 48 Pac. 1, where the court in effect held, that where electors vote the official ballots supplied to them by the judges of election, their legally expressed will cannot be overthrown, where they are not at fault, by the fact that the public officers who prepared the ballots in some way neglected his or their duty.

And *Thomas v. Kent, Circuit Judge,* 116 Mich. 106, 74 N. W. 381. That was a suit in mandamus to compel the circuit judge to dissolve an injunction restraining the submission to the electors of the question of borrowing money to erect an asylum for the insane poor. It was admitted that the ballots used were not literally in accord with the form prescribed by statute; but the court said that they gave the voter information as to the nature of the proposition which the prescribed form would not do, and held the statute directory.

Thus guided, and by the further rule that the intention of the voter is to be ascertained from the language of his ballot interpreted in the light of the circumstances of a public nature surrounding the election (*Clark v. Board of County Com'rs,* 33 Kan. 202, 6 Pac. 311, 52 Am. Rep. 526; *State ex rel. Johnston v. Metzger,* 26 Kan. 395), we are of opinion that such intent is made fairly apparent by the ballot used; that said ballot substantially complied with the ballot prescribed by law and should be given effect; that said courthouse, jail, and bridge bonds, having carried by the necessary three-fifths of the electors voting on the several propositions, are valid.

It is next contended that, as an act entitled "an act for the protection, validation and sale of bond issues of the state, counties, townships and municipalities, and all other political organizations and subdivisions of the state of Oklahoma," which reads:

"Section 1, The Attorney General is hereby made *ex officio* bond commissioner of the state of Oklahoma.

"Section 2. It shall be the duty of such bond commissioner to prepare uniform forms and prescribe a method of procedure under the laws of the state in all cases where it is desired to issue public securities or bonds, in any county, township, municipality or political or other subdivision thereof of the state of Oklahoma; and it shall be the further duty of said bond commissioner to examine into and pass upon any security so issued, and such security, when declared by the certificate of said bond commissioner to be issued in accordance with the forms of procedure so provided shall be incontestible in any court in the state of Oklahoma unless suit thereon shall be brought in a court having jurisdiction of the same within thirty days from the date of the approval of said securities by the bond commissioner,"

—was passed by the Legislature and approved March 24, 1910 (Laws 1910, c. 94), these bonds, to be valid, should have been voted according to forms prepared and procedure prescribed by the bond commissioner as prescribed in said act. Not so, for the reason that as it is not by said act made the duty of the bond commissioner to "examine and pass upon any security" unless "so issued," it is clear that until bonds are issued pursuant to said act said bond commissioner has no duties to perform thereunder with reference to these or any other bonds, and that when said act provided: "Sec. 3. No bonds hereafter issued by any political or municipal subdivision of this state shall be valid without the certificate of said bond commissioner"—it meant bonds "hereafter issued," pursuant to the forms and procedure to be provided by said bond commissioner under said act, which is prospective in its terms. As the bonds in question were voted, prepared, and sold pursuant to law as it then existed before said act was passed, leaving nothing to be done save their execution, said act has no reference to them. But if such reference was intended by said act, the same, as to them, is void as impairing the obligation of the contract for their sale existing at the time of its passage between the municipality and defendant in error, by virtue of that provision of the federal Constitution which declares: "No state shall pass any law * * * impairing the obligation of contracts."

Vol. 26—33

*Moultrie County v. Savings Bank,* 92 U. S. 631, 23 L. Ed. 631, was a suit in *assumpsit* upon certain coupons attached to bonds alleged to have been issued by plaintiff in error. The facts were that section 10 of the act of March 26, 1869 (Priv. Laws Ill. 1869, p. 1), incorporating a certain railroad company, authorized the board of supervisors of Moultrie county to subscribe to the capital stock of said company to an amount not exceeding $80,000 and issue bonds of the county therefor. It also prescribed the rate of interest, and that the same might issue in such denominations and mature at such times as said board might determine, provided, that the same should not issue until the road was in operation for traffic between certain points; that pursuant thereto, on December 16, 1869, said board passed a resolution to subscribe $80,000 to the capital stock of said road; and that said resolution be referred to be put in form for being recorded on the records of the board. Prior to the first Tuesday in March, 1870, said resolution was entered, whereupon the clerk of said court, who was also president of said railroad company, without authority so to do, added on the record of said resolution:

"And it is further ordered that the chairman of said board of supervisors of said county shall issue and deliver to said railroad company the bonds aforesaid whenever said railroad company shall have completed and equipped their said line of railway through said county of Moultrie."

On December 25, 1872, pursuant to report of a special committee appointed by said board to examine the records of subscription of railroad donation, the bonds were delivered. No subscription was made on the books of the railroad company until January, 1871, when such was made by the chairman of said board, without authority of said board and for the purpose of enabling the chairman to vote at an election held by said company. The defense set up by the county against the *bona fide* holders of the bonds was that the authority to make the subscription had expired before the subscription was made, by the revocation of the power to make the subscription by the new Constitution of the

state which took effect July 2, 1870; but the court held not so, and in passing said:

"The resolutions were entered of record by the clerk and president of the railroad company; and the company made an appropriation of the bonds to be received in payment for the subscription, by a contract made on the 15th of April, 1870. In either aspect of the case, therefore, there was an authorized contract existing between the county and the railroad company when the new Constitution came into operation. No matter whether the contract was a subscription or an agreement to suscribe, it was not annulled or impaired by the prohibitions of the Constitution. The delivery of the bonds was no more than performance of the contract. * * * We do not assert that the constitutional provision did not abrogate the authority of the board of supervisors to make a subscription for railroad stock. On the contrary, we think it did. But we hold that contracts made under the power while it was in existence were valid contracts, and that the obligations assumed by them continued after the power to enter into such contracts was withdrawn. The operation of the Constitution was only prospective."

It is contended that the issue of courthouse and jail bonds is void because the notice published in the two weekly newspapers did not contain the correct date of the election, as required by Snyder's Comp. Laws Okla. 1909, § 1715, which provides:

"The board of county commissioners shall give thirty days' notice of the election upon the question of issuing said bonds, by publication in two weekly newspapers of general circulation published at the county seat of the county, unless there be but one weekly newspaper, in which event that one shall be sufficient; and if there be no weekly newspaper, then by five notices posted in five public places within the county. The notices of election shall contain the statement of the county commissioners, as provided by section 2 of this act (1714), date of election, amount of bonds proposed to be issued and whether for courthouse or jail or for both courthouse and jail. The notices shall be signed by the chairman of the board of county commissioners and attested by the county clerk."

The facts disclose that pursuant to the amended resolution changing the date of the election from October 12, 1909, to Oc-

tober 19, 1909, the amended proclamation was, on September 16, 1909, turned over to the Oklahoma Weekly World and Tulsa Democrat for publication. No question is raised as to the correctness of the publication thereof contained in the Tulsa Democrat; but the Oklahoma Weekly World continued to carry the publication of the date of election as of October 12th, at the same time running news items in which the date of the election was correctly stated to be October 19th, and, in one issue in heavy head lines, called attention to the fact of the change of the date. It is not claimed that there was any misapprehension on the part of the voters as to the date of the election. It is conceded that the failure to change the date from October 12th to October 19th was the result of an oversight on the part of the publisher or a mere typographical error, resulting in no injury or prejudice. On this point we are bound by the finding of the court, which is:

"And the court further finds from the evidence that at the election held on the 19th day of October, 1909, at the various voting precincts in said county of Tulsa, state of Oklahoma, to vote upon the issuance of bonds described in the pleadings in said action, the general voting public had knowledge and notice of said election, and participated therein, and no prejudice resulted to the voters of said county by reason of any irregularity in the publication of notice in said election, and whatever irregularity occurred in the publication of said notice in the Oklahoma Weekly World, one of the papers in which the same was published, was a typographical error, and did not mislead the voting public, or any part thereof at said election."

This, we think, was a substantial compliance with the law and in no way affected the validity of the bonds, as it is nowhere claimed or shown that the irregularity complained of deprived a number of electors of the opportunity to vote, sufficient to change the result of the election. When such is the case, the governing rule is laid down in *Town of Grove v. Haskell, Governor, et al.,* 24 Okla. 707, 104 Pac. 56, where the court in the syllabus said: "* * * But where, in a controversy arising out of an

election held, it is shown that the provisions in reference to notice were substantially complied with, and there is no averment or showing that the electors did not have actual notice or knowledge of the election, and failed to participate therein by reason thereof, the same will not be held void or set aside. The vital and essential question in such cases is: Did the want of notice or knowledge result in depriving a sufficient number of the electors of the opportunity to exercise their franchise as to change the result of the election? If not, then the will of the electors, as expressed, should be sustained."

See, also, *City of Ardmore et al. v. State ex rel. Best*, 24 Okla. 862, 104 Pac. 913.

Finding no error, the judgment of the trial court is affirmed. All the Justices concur.