Hitchcock, J.
This bill and amended bill are filed by complainants, as creditors of John Wilson, of Columbus, late dedeased, to set aside conveyances of certain parcels of land, and to have the lands sold and the avails applied towards the payment of 'debts due from the estate of said Wilson. The particular lands in controversy are in-lots 440 and 493, in Columbus. It is, perhaps, improper to say, that there is any controversy with respect to this latter lot. The facts relative to it are, that it was purchased by Wilson in 1838, and by his direction conveyed to his wife. She does not, however, pretend to claim it, and if she did, the claim could not be sustained, as at the time of the purchase and conveyance, Wilson was hopelessly insolvent.
It is claimed, however, that lot number 440 was never the property of Wilson ; that it was, by his direction, conveyed by the former owner to his two children, Thomas and Ann;' that it was intended by him as an advancement, and that the son, after his arrival at full age, conveyed his undivided half of the property to his mother, the defendant Margaret.
The leading facts, as to this property, are the following:
John Wilson, the decedent, some time before 1819, removed from Pennsylvania to Ohio, and took up his residence at or near Chillicothe. He was a man of small means, and was a tanner by trade. His father, whose name was Thomas, was a resident of the State of Pennsylvania, and had little or no property. Thomas Wilson had two brothers, Charles and John. John resided in Baltimore, and became wealthy. About the year 1819 he died, leaving his brothers' CharleS and Thomas his heirs. The amount of the estate of this John Wilson, of Baltimore, is not accurately ascertained. After his death, an arrangement was made between John Wilson, of Ohio, and his *113 father, Thomas, by which John was to administer on the estate of his deceased uncle, and was to have, in consideration thereof, the one equal half of his father’s share in that uncle’s estate. In pursuance of this arrangement, John proceeded to Baltimore, and, in connection with one Sterritt, took letters of administration on his uncle’s estate. At this time he was somewhat, although not very deeply involved. John T. Barr, of Baltimore, a man of wealth, and an old schoolmate and friend of John, was instrumental in procuring for him letters of administration, and was one of his securities — it being the understahding that Sterritt and Barr were to have the principal control in the settlement of the estate. ' .
This John T. Barr was the owner of a farm in the neighborhood of Columbus, containing two hundred and seventy-five acres of land, and also of several lots in the town of Columbus. During the time that -Wilson was in Baltimore, an arrangement was made between him and Barr, by which Barr agreed to sell to him this property at and near Columbus, and to receive compensation, as is supposed, from the estate of the deceased John Wilson, of Baltimore. A part of this property ivas the lot number 440, now in controversy, upon which there was at the time a dwelling house and some other improvements.
John Wilson returned to Ohio and took up his residence at Columbus, occupying the house upon lot 440, and continued in possession until his death, in 1841. While in Columbus, he owned a tannery and carried on the business of tanning.
The estate of the uncle was not finally settled until April, 1829. In that month John Wilson, the decedent, was in Baltimore, for the purpose of making settlement. On the 27th day of the same month, he had a settlement with Barr, and gave him a note for $ 1,952.99, and procured Barr to make a deed to his two children, Thomas and Ann Wilson, for in-lot 440. At this time his son Thomas was eleven, and his daughter Ann five years of age.
The question arises, as to this deed, whether it was made in *114 good faith, as an advancement to thése children, or whether the °9ject was to defraud creditors. It is claimed by the complainants, that a voluntary conveyanee, for the consideration of natural love and affection, cannot 'be sustained, if, at the time, the grantor is-involved in debt. Decisions to this'effect have unquestionably been made in England, and prpbabiy such is the law in that country ; And such seems'to have-been the- decision of Chancellor Kent, in a case decided by him in the State of New York; 3 Johns. Ch. Rep. 481. We do not, however, conceive this to be the correct rule, as generally established in this country: A man may make ah advancement to his child, although-'at the time in debt, provided he has sufficient property remaining to satisfy such subsisting debts'. And if- the advancement is made under such circumstances, it cannot be impeached by subsequent creditors, merely bécause it is voluntary. A person claiming under such advancement, must be prepared, however, clearly aind conclusively to show that^there was other property sufficient to pay all subsisting debts.
• Testimony has been taken in this case, to show the extent of the indebtedness, of' John Wilson in April;..1829, and also as to the value of his property. This'evidence is' not very satisfac-. tory. It,is admitted-,.that he-was indebted-as .trustee .to his father’s éstate, and which is one of the claims'attempted to be , set up in this, bill, in the sum-of $1,805.14, and to John .T. Barr‘in the sum of $1,952.99, making in the whole $3,758.13. It is_ claimed by the complainants, that.there were , other debts which Would'swell the amount to'nearly $7,000.- These' were all eastern .'debts.. There is no evidence as' to any other.
The witnesses differ much as to the value of -his property. It-,consisted of 'the property'purchased of Barr, and-of a tannery, ‘with tire stock -therein.' In estimating the entire value, witnesses wary from 'seven or eight to'twfelve or fifteenthousand dollars. This'is including the lot in controversy, . Exclusive-of that lot, it is at least doubtful whether the other property would have been'sufficient,' under a forced'-sale,-to have1 paid all'the *115 .debts. ‘ We are not prepared,1 however,, to 'say absolutely, that it would not have been sufficient.
But, although ah advancement may be made as before stated,, which,-if' doné in' good faith, cannot be impeached by.-subsé-'" quent .creditors, yet if;.in taking all. the ’circumstances into'con-. ,- sideration/tlie mirid "is-brought to-the cohculsiori -that there was 'a fraudulent design, .’either as to subsisting orsubseqnent. credi-tors, such advancement cannot be sustained.
The evidence in this case shows, 'that' upon á settlement with the Orphan’s Court,- ¿s'trusted .of- his father’s "estate,'which was made in April, 1829, Wilson was.1 fourid in debt $.1-,805.14. On the 27th . day of the samé'month', .he-settled with the Probate Court in Baltimore, and was found in debtand on the same -day, upon settlement, he was. found indéhted to Barr $1,952*99. In ten years'from the time-of undertaking to administer upon his.Uncle’s, estate, from which wealth was expected", he.fóúhd himself indebted to the amount of more1 than $'3,'700, to say nothing of further- indebtedness. And oh -this '.day he received from Barr the deed conveying to his two young children lot number 440. . But .this .deed, -although.'delivered by Barr, to Wilson,' w.as ,not,'by-him, handed-over to the children, -nor was it immediately -placed' upon record. He retained it in his .own .possession, and, continued in possession of the lot.. In .1834, this deed, to the children-still reihiaining unrecorded, he re'ceived.a-de.ed-froih-,Barr,'..conveying .to him, together-.-'with. other' pfd'perty; this' identical'lot. This deed, it' is true, so far 'as' . this lot. is concerned, -was .inoperative. • At' length, -in January, 1835, he ..placed the; deed to .the children upon record, and the next ensuing year put improvements upon the lot to the value of more than three thousand dollars. -.
Under these circumstances^ we cannot but conclude .that .Wilson, finding himself thus in debt, in 1829, when he had expected to be wealthy, became 'apprehensive of eventual failure'; and. for the purpose of -sécuring to himself -and .wife a home, as expressed, to one or more of'thV’witnesses, procured *116 the conveyance to be made as it was. But, still hoping to extricate himself from embarrassment, he kept the deed from record until 1835, when it was delivered and recorded; and from this time he spared no expense to render this house comfortable and convenient.
That his apprehensions were not without foundation, is manifest from the fact that, although during his life his credit was good, yet, at his death, he was found to be involved to the amount of more than eighteen thousand dollars.
But it is contended by the counsel for the defendant, Margaret, that if in the opinion of the Court this deed was fraudulent as to creditors, still that she is entitled to dower in the premises. The act relating to dower (Swan’s Stat. 296,) provides : that the widow shall be endowed “ of one full and equal third £ part of all the lands, tenements and real estate of which her £ husband was seized during the coverture,” and also of ££ one £ third part of all the right, title or interest that her husband, £ at the time of his decease, had in any lands or tenements £ hold by bond, article, lease or other evidence of claim.” In other words, she shall be endowed of one-third of the legal estate of inheritance of which the husband was seized during the coverture, and of one-third of any equitable interests he may have in lands at the time of his death.
That Wilson had an equitable interest in this lot. previous to 1829, there can be no doubt. He was in possession under a purchase from Barr. But, in 1829, he procured it to be conveyed to his children. Now this deed, although fraudulent and void as to credito-s, was good as to Wilson. He could not controvert it. ’ So far as he was concerned, and so far as his wife was concerned, it vested a legal estate of inheritance in the children. Wilson, then, had not, any time during his life, a legal estate of inheritance in this lot. Had he any equitable interest in it at the time of his death ? We think not. As to him, both the legal and the equitable interest was vested in the children, by the deed of 1829.
*117 A number of authorities have been cited, which are claimed to be inconsistent with this opinion. Of these authorities, the case of Robinson v. Bates (3 Metcalf’s Rep. 40,) is the only one which has a direct bearing upon the case under consideration. In that case, Robinson and wife joined in a deed conveying certain lands, she releasing her right of dower. Subsequently, a creditor of Robinson, having obtained judgment and levied upon the land, recovered the same, thereby avoiding the deed, on the ground that it was fraudulent as to creditors. After the death of Robinson, his widow prosecuted her suit for dower. The tenant attempted a defence, on the ground that she had, by the deed before referred to, released her right of dower. But the defence was not allowed, the court holding that the tenant having avoided the deed for fraud, should not afterwards be permitted to set it up as a bar to the widow’s right of dower. The substance of the decision is, that if husband and wife unite in the conveyance of his land for the purpose of defrauding creditors, and the deed is avoided for the fraud, the wife is not thereby barred of her dower.
The case differs from the one now before the Court in this: Robinson had, during the coverture, a legal estate of inheritance in the land then in controversy, whereas Wilson,had not, during the coverture, such legal estate in the land nou> in controversy. Without such legal estate, his widow cannot be endowed, unless, at the time of his death, he had an equitable interest. To the Court, it seems clear that he had no such interest.

Decree for Complainants