THE STATE ex inf. CROW, Attorney-General, v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY.

In Banc, July 3, 1903.

1. **Quo Warranto:** WHEN MAY BE USED: PRIVATE WRONGS. The Attorney-General ex officio, and without leave of court,. has the right at any time to file in the Supreme Court an information in a quo warranto proceeding against a public corporation wherein matters of public interest are involved, but he can not maintain such proceeding solely for the vindication of private rights, or for the redress of private grievances, in which the public has no interest. And if it appear from the information that the object of the proceeding is the vindication solely of private rights, that fact may be taken advantage of by the return, or by a special plea to the order to show cause.

2. ———: ———: ———: .PRIVATE DISPUTES: CORPORATIONS. Quo warranto is not a remedy to determine disputes between private persons and a corporation, or disputes between competing corpora-

tions, but is an inquiry by the State to determine by what right a corporation exercises wrongfully or illegally a certain franchise, or is a proceeding to oust it from the right to be a corporation because of an abuse or non-user of a franchise granted. It will only lie against a corporation for some violation of its charter.

3. ———: ———: ———: "RECONSIGNMENT CHARGE" FOR GRAIN SHIPMENTS. The chief grounds of complaint set out in the information were those affecting certain grain dealers in Kansas City and certain railroad companies whose terminus is in that city, who deny to respondent the right to make a particular charge on grain, called a "reconsignment charge," made by defendant and other through lines of railroad, for service actually rendered after delivering the grain upon certain of its tracks known as "hold tracks," and in transferring cars to such other railroads. This charge is paid solely by certain grain dealers and railroads whose western terminus is at Kansas City for an additional service not covered by the freight into that city, and is absorbed or refunded in case the reshipment out of said city is over the defendant's line or that of any of the other through roads. This transfer service had been performed gratuitously prior to a few months before the quo warranto proceeding was instituted. *Held*, that, since the wrong, if one, does not appear to be done to the public, this "reconsignment charge" is one which the companies have a right to make and is one in which the public has no interest, provided it be nothing more than what is reasonable for the service rendered, and hence there is not sufficient cause for a quo warranto writ ousting the companies from the exercise of their franchises.

4. ———: ———: ———: ———: STATUTE. The statute which requires the initial carrier of freight to deliver it upon any track it owns, leases, uses or can use, does not deprive it of the right to assess and collect a reasonable compensation for such extra work.

5. ———: ———: ———: ———: CUSTOM. Nor does the fact that the companies formerly performed this reconsignment service free of charge authorize a quo warranto. No legal right can be predicated upon such a custom. Usage can not make a contract where there is none.

6. ———: ———: ———: ———: INTERSTATE COMMERCE. The validity of all charges for services rendered in connection with interstate transportation is vested exclusively in the Interstate Commerce Commission and the courts of the United States, and the validity of the "reconsignment charge" for transferring freight brought into this State by a railroad running from the Rio Grande to Chicago, and here transferred to another line, or after its delivery on a "hold track" to the consignee elsewhere in the city, by the express provision of the Interstate Commerce Act, is to be determined by such Federal authority.

State ex inf. v. A., T. & S. F. Ry. Co.

7. ———: ———: INTERSTATE COMMERCE. The State has no power or authority to forfeit the right or franchise of a common carrier doing an interstate business or to oust any such carrier from the exercise of its right to charge tolls or fares for interstate transportation.

8. ———: ———: DISCRIMINATIONS: UNLAWFUL CHARGES: STATUTORY REMEDY EXCLUSIVE. The remedies pointed out by the Missouri statutes to any individual who sustains damages, because of unjust or unreasonable rates or charges, or discriminations or preferences, to appeal to the railroad commission for redress, and giving that commission the right to appeal to the courts for assistance in the enforcement of its orders, are exclusive; and those statutes being broad enough to include "reconsignment charges" for the transfer of cars from one railroad to another within this State, or for the delivery of the cars to the consignee elsewhere in the city after their delivery on the "hold track," it is not within the jurisdiction of the Supreme Court to entertain a quo warranto against a railroad company which is guilty of making such charges.

9. Railroads: EXTORTIONATE CHARGES: JURISDICTION. The right of action in favor of the shipper against the common carrier existed at common law for extortionate rates, but the statute placing in the hands of the railroad commissioners jurisdiction over such matters has superseded the common law remedy.

## Quo Warranto.

WRIT QUASHED.

*Edward C. Crow,* Attorney-General, for informant; *Frank Hagerman* and *Adiel Sherwood* of counsel.

(1) Information in the nature of a quo warranto is now the proper remedy where a corporation having a legal existence has forfeited its charter as well as where a *de facto* corporation assumes to exercise corporate powers without authority. Scire facias having formerly been used in the first case and the information in the second. State v. Eq. Loan Ass'n, 142 Mo. 325. It is the proper remedy to test the right to exercise particular franchises not within the terms of the charter, and to oust the corporation therefrom. State v. Tay-

lor, 25 Ohio St. 279; People v. Board of Education, 101 Ill. 308; State v. Regents, 55 Kan. 389; State v. Topeka, 31 Kan. 454; People v. Trustees, 5 Wend. (N. Y.) 211; People v. Y. M. Ben. Soc., 41 Mich. 67; State v. Railroad, 53 Ohio St. 190; Com. v. Eq. Ben. Assn., 137 Pa. St. 412; People v. Railroad, 15 Wend. (N. Y.) 113; Com. v. Railroad, 53 Pa. St. 9; Com. v. Railroad, 53 Pa. St. 62; State v. Cincinnati Gas L. Co., 18 Ohio St. 262. Gross abuse of a corporate franchise is a cause of paramount importance, of which the Supreme Court will take jurisdiction. State v. Railroad, 45 Wis. 585; State v. Ashley, 1 Ark. 304; State v. Stewart, 32 Mo. 379. Where the Legislature has not provided who shall determine whether quo warranto shall be brought (where the Legislature has power to so determine), the discretion is vested in the Attorney-General; the discretion is a judicial discretion over which the courts have no control. State v. Gleason, 12 Fla. 212; State v. McCann, 88 Mo. 386; State v. Meek, 129 Mo. 436; High, Extr. Leg. Rem. (3 Ed.), 615, 619. Information in nature of quo warranto lies in all cases where the ancient writ could be maintained. Lindsey v. Atty.-Genl., 33 Miss. 509; Com. v. Murray, 11 Serg. & R. 73; Rex v. Dawes and Rex v. Martin, cited in Rex v. Clarke, 1 East 43; Rex v. Trevenen, 2 B. & Ald. 482. The Attorney-General may file an information against a body corporate, in its corporate name, compelling it to show by what title it holds a franchise alleged to be usurped. Rex v. Cusack, 2 Roll. 115; Comyn's Dig., Quo Warranto (A); Rex v. Shepherd, 4 T. R. 381; Rex v. Williams, 1 Burr. 407; Selwyn, N. P. (9 Ed.), 1167; Rex v. Corp. of Carmathen, 2 Burr. 869 (1 W. Black. 187). The Attorney-General may also file an information against a corporate officer to compel him to show by what title he exercises a particular franchise, claimed in his official capacity. Rex v. Hertford, 1 Salk.; 1 Ld. Raym. 426; Rex v. Ogden, 10 B. & C. 230; State v. Patterson Turnpike Co., 1 Zab. (N. J.) 9; Com. v. Fowl-

er, 10 Mass. 295; State v. Patterson Turnpike, 1 Zab. (N. J.) 9; People v. Geneva College, 5 Wend. 220. The writ of quo warranto is the proper remedy for usurpation of a franchise. Reynolds v. Baldwin, 1 La. Ann. 162; State v. Ramas, 10 La. Ann. 420. When the State creates a corporation, the grant of power is upon the implied condition that the corporation shall act within the powers thereby conferred. *Ultra vires* acts, whether wrong or not, are breaches of this condition; such acts do not of themselves end the existence of the corporation but are grounds for direct proceedings by the State for judgment of forfeiture. People v. N. R. Sugar Ref. Co., 121 N. Y. 582 (18 Am. St. Rep. 843); 1 Smith's Cas. 943; 1 Cum. Cas. 570; State v. Oberlin Bldg. Ass'n, 35 Ohio St. 258. For a neglect or abuse of its franchise, a corporation may forfeit its charter as for condition broken, or for a breach of trust. Ang. & Ames. Corp., sec. 774; Com. v. Railroad, 58 Pa. St. 26; Washington Road v. State, 19 Md. 239; Canal Co. v. Railroad, 4 G. & J. 1; Com. v. Ins. Co., 5 Mass. 230; State v. Manhattan Co., 9 Wend. (N. Y.) 351; People v. Kingston Turnpike Co., 23 Wend. (N. Y.) 193; People v. Washington Bank, 6 Cowan (N. Y.) 211; People v. Bank of Hudson, 6 Cowan (N. Y.) 217; Coon v. Railroad, 32 Mich. 248. (2) The remedy was frequently used to oust a corporation from franchises, rights, liberties and privileges illegally exercised, that is, exercised without authority of law, and without any attempt or intention of affecting the right of the corporation to be a corporation, and to exercise its proper rights, privileges and franchises, i. e., to secure a judgment ousting a corporation only from the exercise of the franchises, rights and privileges illegally assumed and usurped. When a corporation is guilty of exercising powers not authorized by charter, the State, instead of proceeding against it to obtain a judgment of forfeiture, may proceed in quo warranto to obtain a judgment merely ousting it from the further exercise of the

illegal and unauthorized powers. People v. Ins. Co., 15 Johns (N. Y.) 358; Attorney-General v. Salem, 103 Mass. 138; People v. Railroad, 12 Mich. 389. Quo war-ranto is the appropriate remedy to oust a corporation from the exercise of particular franchises and powers not conferred by law. State v. Topeka, 31 Kan. 452 (30 Kan. 653); State v. Bingham, 7 Ohio Cir. Dec. 532 (14 Ohio Cir. Ct. 245). And this ouster from fran-chises unlawfully assumed does not affect the corpora-tion with respect to its proper franchises. State v. Equitable Loan Ass'n, 142 Mo. 341; State v. Borwalk Turnpike Co., 10 Conn. 167; Railroad v. People, 84 Ill. 426; People v. Railroad, 54 Ill. App. 348; Danville Plank Road Co. v. State, 16 Ind. 456; State v. Portland Nat. Gas Co., 153 Ind. 483; At-torney-General v. Railroad, 96 Mich. 65; People v. Rail-road, 15 Wend. (N. Y.) 113 (30 Am. Dec. 33); People v. Geneva College, 5 Wend. (N. Y.) 211; State v. Day-ton Traction Co., 10 Ohio Cir. Dec. 212 (18 Ohio Cir. Ct. 490); State v. Railroad, 53 Ohio St. 189; State v. Stan-dard Oil Co., 49 Ohio St. 137; Com. v. Sturtevant, 182 Penn. St. 323 (37 Atl. 916); Com. v. Del. & H. Canal Co., 43 Penn. St. 301; State v. Portage City Water Co., 107 Wis. 441; People v. Pullman Car Co., 175 Ill. 125. The right to build gates and collect tolls upon roads, bridges, canals, ferries or dams, or any other highway, is a franchise triable in quo warranto; also the right to use streets and highways for the purposes of laying pipes, street railroads, etc. To collect tolls: State v. Centreville Bridge Co., 18 Ala. 617; Chandler v. Montg. Co., 31 Ark. 25; State v. Volcano Rd. Co., 100 Cal. 87; State v. Norwalk Turnpike Co., 10 Conn. 166; Whelchel v. State, 76 Ga. 644; Com. v. Lexington T. R. Co., 6 B. Mon. (Ky.) 398; State v. Alcott, 6 N. Y. 74; State v. Barron, 57 N. H. 498; State v. Hillsdale T. R. Co., 23 Wend. (N. Y.) 254; Thompson v. People, 23 Wend. (N. Y.) 537; People v. Bristol T. R. Co., 23 Wend. (N. Y.) 193; People v. Kingston T. R. Co., 23 Wend. (N.

Y.) 222 (35 Am. Dec. 551); Rixley v. Roanoke Nav.
Co., 75 Va. 320.   To operate ferries:  Darnell v. State,
48 Ark. 321; Young v. Farrison, 6 Ga. 130; Com. v.
Sturtevant, 182 Pa. St. 323.   To build dams:  Valen-
tine v. Berrien Springs W. P. Co. (Mich.), 87 N. W.
370; Attorney-General v. Blosom, 1 Wis. 317; State v.
Brown, 33 Miss. 500; State v. Com. Bank, 12 Smed. &
M. (Miss.) 276.   To use streets and highways:  People
v. Railroad, 117 Cal. 606; State v. Railroad, 140 Mo.
539; State v. Seattle Gas Co. (Wash.), 68 Pac. 946;
State v. Portage St. Water Co., 107 Wis. 612; State v.
Mil. Gas Light Co., 29 Wis. 454.   "Information in the
nature of quo warranto may be maintained by the State
through the Attorney-General to restrain a corpora-
tion from exercising a particular franchise, power or
authority, not possessed by it under its charter or gov-
erning statute."   State v. N. Y., 32 Barb. (N. Y.) 35;
Com. v. Del. & Hud. Canal Co., 43 Pa. St. 295; 3 Thomp-
son, Corps., sec. 6807; Thompson v. People, 23 Wend.
(N. Y.) 374.   A private relator has no right in a mat-
ter involving no grievance peculiar to him to file an in-
formation in the nature of quo warranto under the stat-
ute of Anne or any statute fashioned thereon, that is to
say, wherever the question of usurpation of a franchise
by a corporation affects the public generally, and not
a private person in particular, the State alone can act
and through its Attorney-General or other prosecuting
officer.   Com. v. Allegheny Bridge Co., 20 Pa. St. 185;
Murphy v. Farmers Bank, 20 Pa. St. 415; Com. v. Rail-
road, 20 Pa. St. 518; Com. v. Chuley, 56 Pa. St. 270, 94
Am. Dec. 75; State v. Vail, 53 Mo. 190; State v. Patter-
son Turnpike Co., 21 N. J. 9.   The abuses of a franchise
granted by the State being a public wrong, the proceed-
ing should be instituted by the public prosecutor, and
a private citizen is not entitled to the aid of this extra-
ordinary remedy, even though he be a creditor of the
corporation.   The information in such case is a public
prosecution involving the very existence of the corpora-

tion, having for its object the recovery to the State of a forfeited franchise, and not the redress of a private grievance. High, Ex. Leg. Rem. (3 Ed.), sec. 654. In this State the proceeding has always been regarded as a civil remedy. State v. Lupton, 64 Mo. 415, 27 Am. Rep. 253; State v. Equitable Assn., 142 Mo. 335; State v. Vail, 53 Mo. 97; State v. Lawrence, 38 Mo. 535; State v. Stewart, 32 Mo. 379; State v. Alt, 26 Mo. App. 673. (3)    The Attorney-General, ex-officio, exercises his own discretion, and without leave of court has the right at any time to file in the Supreme Court an information in the nature of quo warranto. State v. Rose, 84 Mo. 198; State v. Stewart, 32 Mo. 379. When the Attorney-General files an information ex-officio for a writ of quo warranto, the writ goes as of right. State v. Berkley, 140 Mo. 184, 41 S. W. 732; State v. Balcom, 71 Mo. App. 27; State v. Railroad, 140 Mo. 539, 41 S. W. 955; State v. Vail, supra; State v. Jenkins, 25 Mo. App. 484; State v. Stewart, supra; State v. Equitable Assn., supra; State v. McMillan, 108 Mo. 153; State v. Frazier, 98 Mo. 426; State v. Rose, 84 Mo. 198; Tyree v. Bingham, 100 Mo. 451. (4)    (a)    There is not a word and not a line in the informations which even remotely suggest that "the object sought thereunder is the vindication of purely private rights and the redress of private grievances in which the public has no interest." Nor is there any justification for the bald assumption that this court has no jurisdiction herein. The proceeding is brought by the State on information of the Attorney-General ex-officio to compel obedience to the laws of this State as declared in the Constitution of the State, and various statutes passed in pursuance thereof, and to compel that obedience by railroad corporations organized under the laws of this State since the adoption of the Constitution of 1875, the benefits and burdens of which Constitution such railroad companies have accepted as the condition of their continuance in business in Missouri and to compel performance of duties im-

posed by the common law and by ordinances of St. Louis and Kansas City. The proceeding shows gross discrimination, extortions, the levy and collection of charges without authority of law, the repeated failure of the railroads to obey the law and to comply with their contracts with shippers, and the information shows the effort and combination and conspiracy of the railroads to form monopolies, and to prevent shippers from using natural highways of commerce like the Mississippi river. If such a proceeding is not a public prosecution, is not a public proceeding and is not brought for the benefit of the entire people of the State, it would be well for respondents to present some authority for their assumption and to justify their assurance. (b) The informations show that the railroads demand, collect and receive a charge for service not rendered when they arbitrarily refuse to make delivery of various commodities consigned to St. Louis or Kansas City without an extra charge, a reconsignment charge so called, because they assert and assume that a delivery has been made when a car of merchandise has been placed by them upon their "hold tracks" located in many instances miles from any point where the cars can be unloaded, and this delivery is claimed, too, under bills of lading reading St. Louis and Kansas City, respectively. The information shows also that four railroads in Kansas City have combined and confederated together for the purpose of forming a monopoly and controlling the shipments of grain into and out of Kansas City, and that this combination and conspiracy is aided and assisted by placing a charge, reconsignment charge so called, upon every car of grain or grain products which comes into Kansas City and goes out of Kansas City over some line of railroad other than one of said four railroads, while if said car of grain or grain products were shipped out of Kansas City over one of said lines of railroad, there would be no charge whatever, thus placing and enforcing a tax upon the use of every

other railroad running out of Kansas City except said
four railroads.    The situation in St. Louis is somewhat
similar; there no charge is made upon any car of grain
or grain products which passes through St. Louis and
destined to points beyond, while the reconsignment
charge is enforced against any car of grain or grain
products which comes to St. Louis and stops there, or
which comes to St. Louis and is destined to points be-
yond via barge lines on the Mississippi river—in other
words, a car of grain or merchandise shipped to St.
Louis for points beyond by rail would not have to pay
the charge, while a car shipped to St. Louis and then
ordered to points beyond by rail or to points beyond
via the Mississippi river would have to pay the charge,
thus evidencing the purpose of increasing freight rates
under the guise of reconsignment charges so called, and
of discriminating against St. Louis as a market city—
the service in each case being exactly the same—and
the refusal to comply with the State law and city ordi-
nances and perform contracts and contractual obliga-
tions.    The same discrimination against Kansas City
as a market city is shown in the informations filed
against the Kansas City railroads.    All of these usurp-
ations and unlawful exercises of franchises, rights and
privileges not authorized by law and directly contrary
to the Constitution and laws of the State, and to the laws
of commerce and against the custom of transacting bus-
iness in St. Louis and Kansas City, and against the cus-
tom and agreements heretofore followed and performed
in St. Louis and Kansas City, certainly make a show-
ing, of "sufficient facts stated therein to constitute a
cause of action."  (c)  The  information  discloses
"unlawful exercises" of rights, privileges and fran-
chises "which this court has authority or jurisdiction
to inquire into," and which it is the duty of this court
to "adjudicate concerning in this proceeding."    It may
well be asked if this court in such a case has no juris-
diction and such an information does not show an un-

lawful exercise of rights, liberties, privileges and franchises when and where such a case would arise and what statement of facts would bring such a conclusion? (d) The power of Congress to regulate interstate commerce does not prevent the State from enforcing regulations which may affect commerce between the States, but which prevent combinations and conspiracies against the laws of the State, and the formation of monopolies, and the punishment and prevention of acts done wholly within the State, nor does the power of Congress to regulate interstate commerce prevent the punishment and the prevention of discrimination and extortion within the State, nor does the power of Congress to regulate interstate commerce prevent the State from enforcing contractual obligations against corporations which were incurred and entered into as a condition of the grant of corporate powers and franchises. In fact, the claim that this proceeding seeks to interfere with the regulation of interstate commerce by Congress is another mere assumption easily brushed aside when we remember that respondents do not make any reconsignment charge on interstate traffic, but that they do make a reconsignment charge upon traffic coming into St. Louis or Kansas City, notwithstanding the same service is performed with respect to interstate commerce as that performed with respect to intrastate commerce. There is no showing in the information that interstate traffic is involved. W. U. Tel. Co. v. James, 163 U. S. 650; Munn v. Illinois, 94 U. S. 113; Bridge Co. v. Railroad, 37 Rep. 618; Sands v. Imp. Co., 123 U. S. 295; Packet Co. v. Keokuk, 95 U. S. 84; Lindsay & Phillips Co. v. Mullen, 176 U. S. 146; McCann v. Eddy, 133 Mo. 59; Railroad v. McCann, 174 U. S. 580; Railroad v. Solan, 169 U. S. 133; Bagg v. Railroad, 14 L. R. A. 596; Graham v. Railroad, 118 U. S. 168; Railroad v. Wheeler, 1 Black 286; Railroad v. Railroad, 136 U. S. 356; Railroad v. Railroad, 23 Fed. 565; Oil Co. v. Texas, 177 U. S. 43; Railroad v. Kentucky, 161 U. S.

703; Railroad v. Memphis, 96 Fed. 113; State v. Sickmann, 65 Mo. App. 499; Railroad v. State, 142 Ind. 428; State v. Railroad, 24 W. Va. 783, 49 Am. Rep. 290; Railroad v. Alabama, 128 U. S. 96; Railroad v. Lillard, 16 S. W. 654; State v. Railroad, 68 Minn. 381; Railroad v. New York, 165 U. S. 632; Commrs. v. Railroad, 63 Me. 269, 18 Am. Rep. 208; R. R. Com. Cases, 116 U. S. 307; Dow v. Beidelman, 125 U. S. 680; Ga. R. & B. Co. v. Smith, 128 U. S. 174; Railroad v. Miller, 132 U. S. 75. The use to which corporate franchises may be put, and the circumstances under which they may be forfeited are questions which belong purely to the State by which the franchise was granted; the power to purchase, or to combine, or consolidate with competing lines is one which the State may grant or not at its discretion. Railroad v. Ky., 161 U. S. 703; Montgomery's Appeal, 136 Pa. St. 96; Railroad v. Com., 7 Atl. 368; Boardman v. Railroad, 84 N. Y. 157; Railroad v. State, 72 Tex. 404; Railroad v. Rushing, 69 Tex. 306; State v. Railroad, 24 Neb. 143; Currin v. Railroad, 48 N. H. 321; Railroad v. Railroad, 41 La. Ann. 970; Clark v. Railroad, 50 Fed. 338; Hamilton v. Railroad, 49 Fed. 412; Kim v. Railroad, 46 Fed. 888; Langdon v. Brace, 37 Fed. 449. Liability does not cease till delivery, and the carrier must obey instructions of shipper as to delivery. Railroad v. Day, 20 Ills. 375; Railroad v. Scott, 42 Ills. 139; Bartholomew v. Railroad, 53 Ills. 231; M. D. T. Co. v. Hallock, 64 Ills. 286; Railroad v. Friend, 64 Ills. 304; Railroad v. Sawyer, 69 Ills. 291; Railroad v. Jenkins, 103 Ills. 599; Railroad v. Bensley, 69 Ills. 630; Railroad v. Warren, 16 Ills. 502. The consignee is entitled to a reasonable opportunity to examine the goods and ascertain their quality before he determines whether to accept them or not, and a reasonable detention for that purpose can not be regarded as an acceptance. Percival v. Blake, 2 Carr & P. 514; Lyon v. Hill, 46 N. H. 51; Railroad v. Bartlett, 7 H. & N. 400; Avery v. Stewart, 2 Comm., 74; Isherwood v.

Whitmore, 11 Meesom & W. 350; s. c., 10 M. & W. 57; Hutchison, Carriers, sec. 392.

*Edward D. Kenna, Robert Dunlap, Gardiner Lathrop* and *Samuel W. Moore* for respondent.

(1) Quo warranto will not lie where merely private rights or interests are involved. 2 Spelling on Injunctions and Other Extraordinary Remedies (2 Ed.), secs. 1773, 1830; 1 Beach on Private Corporations, sec. 58; State ex rel. v. Meek, 129 Mo. 436; Ramsey v. Carhart, 27 Ark. 12; Cupit v. Bank, 20 Utah 293; People v. Cooper, 139 Ill. 461; People ex rel. v. Bridge Co., 13 Colo. 11; People v. Railroad, 8 Colo. App. 301; State v. Railroad, 50 Ohio St. 239; Territory v. Virginia Road Co., 2 Mont. 104; People v. Railroad, 8 Colo. App. 301; Attorney-General v. Railroad, 96 Mich. 65; Attorney-General v. Salem, 103 Mass. 138; People v. Drainage Commissioners, 31 Ill. App. 219; Reagan v. Loan & Trust Co., 154 U. S. 362. (2) Quo warranto will not lie where there is another and adequate remedy. High on Extraordinary Legal Remedies (2 Ed.), secs. 617, 649; 2 Spelling on Injunctions and Other Extraordinary Remedies (2 Ed.), sec. 1775; People ex rel. v. Springfield, 61 Ill. App. 86; State v. Shields, 56 Ind. 528; State ex rel. v. Wilson, 30 Kan. 661; People v. Turnpike Co., 2 Johns. (N. Y.) 190; People v. Gas Light Co., 38 Mich. 154; Stultz v. State, 65 Ind. 429; State ex rel. v. Kingan, 51 Ind. 142; State ex rel. v. Turnpike Co., 38 Ind. 71. (3) Quo warranto will not lie for the violation of an alleged custom to gratuitously perform the service for which the reconsignment charge is now made. Such custom is nothing more than the usage or practice which has heretofore obtained, upon which no legal right can be founded. Ocean Beach Association v. Brinley, 34 N. J. Eq. 438; 27 Am. and Eng. Ency. of Law, 712; Ulmer v. Farnsworth, 80 Me. 500; Bank v. Burkhardt, 100 U. S. 692; Tilley v. County of Cook, 103

U. S. 155.   (4)   Quo warranto will not lie in this court to control or affect a railway company in making, charging and collecting rates for interstate transportation, or in making and collecting charges for services rendered in connection therewith.   Interstate Commerce Act, 24 Statutes at Large 379; 3 U. S. Compiled Statutes 1901, pp. 3154 to 3172 inclusive; amendatory act, 25 Statutes at Large, 855; 3 Compiled U. S. Statutes, pp. 3154-3172, inclusive; Act of Congress to Further Regulate Commerce, of February 19, 1903, sec. 5228, R. S. U. S.; Bridge Co. v. Kentucky, 154 U. S. 204; Interstate Commerce Commission v. Railroad, 167 U. S. 633; Rhodes v. Iowa, 170 U. S. 412; Gatton v. Railroad, 95 Iowa 112; Fielder v. Railroad, 42 S. W. 362; Copp v. Railroad, 43 La. Ann. 511; Carlisle v. Railroad, 168 Mo. 652.   (5)   A common carrier does not derive its right to make or charge tolls, rates or charges for interstate transportation, or for services rendered therefor, or in connection therewith, from the State, but from the Federal Government. The State, therefore, has no jurisdiction or power to forfeit such right or franchise, or to oust an interstate common carrier from the exercise of any portion thereof.   Sec. 5258, R. S. U. S. 1878; Pensacola Tel. Co. v. Tel. Co., 96 U. S. 1; Pembia Mining Co. v. Pennsylvania, 125 U. S. 185; California v. Railroad, 127 U. S. 1; Railroad v. Pennsylvania, 136 U. S. 114; Mining Co. v. New York, 143 U. S. 315; Postal Tel. Co. v. Adams, 155 U. S. 696; Stockton v. Railroad, 32 Fed. 9; Packet Co. v. James, 32 Fed. 21; Ex Parte Stockton; 33 Fed. 95; State of Indiana v. Pullman Palace Car Co., 16 Fed. 183; Territory v. Lockwood, 3 Wall. 236; McClung v. Silliman, 6 Wheat. 598; State v. Curtis, 35 Conn. 374; State v. Bowen, 8 S. Car. 400; American Tel. Co. v. Tel. Co., 67 Ala. 26.   (6)   Even if the subject-matter herein involved is not interstate, but is within the control and under the jurisdiction of the State of Missouri, which we deny, quo warranto will

not lie to control a railroad company in making, charging and collecting rates for transportation, and charges for services rendered therefor, or in connection therewith. Art. 12, Constitution of Missouri, secs. 12, 14 and 23; Art 2, chap. 12, R. S. 1899, secs. 1126-1160; State ex rel. v. Francis, 88 Mo. 557; State ex rel v. Mason, 77 Mo. 189; State ex rel. v. Marlow, 15 Ohio St. 114; Commonwealth v. Garrigues, 28 Pa. St. 9; Commonwealth ex rel. v. Henszey, 81 1-2 Pa. St. 101; Baker v. Railroad, 36 Mo. 544; Soulard v. City, 36 Mo. 546; Railroad v. Railroad, 149 Mo. 245; Young v. Railroad, 33 Mo. App. 509; Winsor Coal Co. v. Railroad, 52 Fed. 716. (7) Quo warranto will not lie merely to test the legality of an act of a corporation. High on Extraordinary Legal Remedies, sec. 618 (2 Ed.); 2 Spelling on Injunction and other Extraordinary Remedies, sec. 1775; 23 Amer. and Eng. Ency. of Law (2 Ed.), 639; 23 Ame. and Eng. Ency. of Law, 641; State ex rel. v. Road Co., 37 Mo. 496; State ex rel. v. Whitcomb, 55 Ill. 172; State ex rel. v. City, 61 Ill. App. 86; State ex rel. v. City, 31 Iowa 433; State v. Evans, 3 Ark. 585; McDonald v. Board of Supervisors, 91 Mich. 459; Dart v. Houston, 22 Ga. 539; Leigh v. State, 69 Ala. 266; State v. Newark, 57 Ohio St. 430; State ex rel. v. Railroad, 50 Ohio St. 239; State ex rel. v. Manufacturing Co., 40 Minn. 213; State ex rel. v. Turnpike Co., 38 Ind. 71; State v. Smith, 55 Tex. 447; Attorney-General v. Salem, 103 Mass. 138; Commonwealth v. Bridge Co., 20 Pa. St. 185.

BURGESS, J.—This is a proceeding by quo warranto *ex informatione* the Attorney-General, against the respondent, The Atchison, Topeka & Santa Fe Railway Company, a railroad corporation doing business in this State, to oust it from the exercise of certain rights, privileges and franchises alleged to be illegally exercised by it.

The information alleges that the respondent is a

corporation of the State of Kansas, operating lines of railway extending through the Territory of Oklahoma and the States of Colorado, Kansas, Nebraska, Missouri, to Chicago, Illinois; and extending west and south from Kansas City to San Francisco, Los Angeles and San Diego, California, and the Rio Grande river; that it has no authority to do any business in Missouri except as a foreign railroad corporation, having complied with its laws and obtained a certificate to do business in the State; that Kansas City is a market city for grain and grain products, with large mills and elevator facilities, and being located on the lines of many railroads, it reaches the eastern, western, northern and southern markets; that it is important to the people of this State that Kansas City be maintained as a grain market; that there is in Kansas City a large number of firms or companies employing a large number of men, and having a large investment of capital in the business of dealing in, buying and selling, storing and handling of grain, many of them doing business as commission merchants, and all of whom have made their investments upon the faith of the course of business hereinafter stated; that Chicago and the cities and towns upon the Mississippi river are strong competitors of Kansas City for grain: that it has been customary to ship grain to Kansas City in car and train load lots, and place the same on what are called "hold tracks," for inspection, barter and sale, and subsequent directions for delivery in the city of its destination; that on the faith of such universal custom and usage, large numbers of the citizens of this State and especially said persons at Kansas City have engaged in the grain, elevator, milling, feed and stock business and invested large sums of money therein; that the course of business has been, in shipping grain to Kansas City, for the shippers to draw drafts against the shipments with bills of lading attached, with the right to the consignee to inspect the shipments on the "hold tracks" before making pay-

ment of such drafts; that about 57,000 cars of grain are brought into the Kansas City market and placed upon the "hold tracks" in the course of a year, of which about sixty-seven per cent is brought in by the Santa Fe, Missouri Pacific, Rock Island and Burlington railway companies; that up to July 28, 1902, the universal custom at Kansas City and all cities west of the Mississippi river had not only been to place the cars upon the "hold tracks," but to take them from thence to the point of delivery in said city designated by the consignee, without additional charge for so much of the carriage as passed over the tracks of the initial carrier or the tracks used by it; that switching charges over the tracks of connecting lines were made, averaging about three dollars per car; that forty-eight hours free time for inspection, sale and delivery of cars, after arrival on "hold tracks" is allowed, a charge of one dollar per day per car being thereafter charged for demurrage; that the grain coming to Kansas City is largely sent to elevators for cleaning and grading and subsequent shipment out; that there are a number of lines of railway of which Kansas City is the western terminus, which are the competitors of respondent and the other through lines above mentioned for traffic destined from or through Kansas City to eastern and southern points, and such companies seek to carry a part of the grain brought into Kansas City by respondent to points east, south and north of Kansas City; that respondent and other through lines use every effort and endeavor to carry all the grain brought through or to Kansas City by them from points on their lines to points east, north and south of Kansas City; that if they succeed, competition between the various railroads for the haul east, north and south of Kansas City will be destroyed, which competition is beneficial to the public; that the Burlington, Missouri Pacific, Santa Fe and Rock Island railway companies are the only companies having lines extending from the west through Kansas City, extend-

ing east thereof and reaching the Gulf ports and the ports upon the Great Lakes; that said four companies have adopted the practice of having large elevators constructed on their lines in the heart of the grain-producing country, for the storage of grain, for the purpose of having such grain carried over their lines for the longest possible distance and to said Gulf and Lake ports, and they seek to impose a reconsignment charge at Kansas City of a sufficient amount to deter producers of grain from shipping the same to the Kansas City market; that to protect themselves against those producers and dealers who will not ship over the lines of said four companies to markets east and south of Kansas City, said companies conspired and confederated to adopt some device or scheme in the way of an unlawful delivery charge for delivery at said Kansas City from the "hold tracks" to the point in Kansas City, Missouri, designated by the consignee, which would enable them to haul out of Kansas City practically all the grain destined east, north and south thereof; that such scheme is oppressive to the public, a burden to the Kansas City market, interferes with shipments thereto, and places the consumers, merchants and people of that city and those there dealing in grain at a disadvantage in attempting to compete with the eastern, northern and southern markets; that the result of the combination and conspiracy is to divert grain from the Kansas City market, which legitimately would flow to the said market or pass through the same for sale and ultimate disposition; that said grain is concentrated at western points and shipped over said lines to points south, east and north of Kansas City; that the device and scheme so adopted was this: that said four through lines would make an extra charge, called a "reconsignment charge" of two dollars per car for delivering any car of grain in Kansas City, Missouri, at any connection with any other railroad, or at any warehouse or mill or elevator or private industry therein, in ad-

dition to the switching and demurrage charges herein-
before mentioned, and in addition to the freight charge
made for carrying such grain to the consignee at Kan-
sas City; that notice thereof was given making said
charge effective on the 28th day of July, 1902; that said
charge is ultimately paid by the producer, places the
Kansas City market at a disadvantage as compared with
other concentrating points west of the Mississippi river,
and is wholly unwarranted by law; that said reconsign-
ment charge is absorbed or refunded if grain coming
into Kansas City over one of said four lines is taken
out of said city east, north or south upon any of the
other of said four lines, but not if it goes out over any
other line; that the effect of said absorption or refund-
ing of said charge is to create a monopoly in the buy-
ing, selling and dealing in grain in favor of those who
can and will ship out of Kansas City over one of said
four lines; that the scheme and plan aforesaid is a
discrimination in Kansas City, Missouri, in charges and
facilities between transportation companies and individ-
uals contrary to the laws of the State of Missouri; that
an exclusive right and privilege is thereby given to
shippers out of Kansas City over said four lines, con-
trary to the Constitution and laws of Missouri; that said
shippers have an unlawful advantage over persons,
firms and corporations, who do not so ship, and who are
engaged in similar business under similar circumstan-
ces and conditions at the same place; that the compe-
tition of other railroads for the transportation out of
Kansas City of the sixty-seven per cent of the grain or
grain products received thereat over said four lines is
thereby prevented; that said reconsignment charge con-
stitutes a discrimination against the locality of Kansas
City because no such charge is made upon grain or
grain products transported to any other city in the
State and afterwards transported therefrom; that under
the laws of the State, it is the duty of every railroad

company to deliver grain at every point designated by the consignee on the line of such road, including crossings with other lines, without discrimination; that the result is that the respondent is illegally charging two dollars on each car of grain shipped to Kansas City, Missouri, for delivering the same in said city to the point on its lines designated by the consignee, under the false and fictitious pretense that it has the right to place the car upon the "hold tracks," notify the consignee of its arrival at such point, and then when he designates the place of delivery, to make such charge for such delivery by calling it a reconsignment charge, and then refund same only to the shipper or consignee who will ship from Kansas City, Missouri, over their lines or any one of the said four through lines a like amount of grain or grain products.

The defendant filed answer and return to the information in which are raised both issues of law and of fact.

The issues of law, upon which the cause is now submitted, are as follows:

"1.   That plaintiff ought not to have or maintain its aforesaid action because it appears upon the face of said information that the object sought thereunder is the vindication of purely private rights, and the redress of private grievances, in which the public has no interest, and for which there is full and adequate remedy both at law and in equity, available to each and all of the parties interested therein; and an original proceeding by information in the nature of quo warranto is not a proper remedy therefor, and this court has no jurisdiction over said matters in this proceeding.

"2.   That there is no usurpation or unlawful exercise of any franchise, right or privilege set out in said information, and no sufficient facts stated therein, to constitute a cause of action, or to entitle informant to the judgment prayed, or any relief whatever, in this proceeding.

"3. That there is no unlawful exercise of any rights, privileges or franchises shown in and by said information, which this court has authority or jurisdiction to inquire into, or adjudicate concerning in this proceeding."

It is insisted by defendant that the information shows upon its face that it is prosecuted solely for the vindication of private rights and the redress of private grievances, in which the public has no interest and therefore this proceeding can not be maintained. Upon the other hand, it is asserted that there is nothing in the information to justify such claim, but even if there was this court has no power to interfere with the determination of the Attorney-General upon an information of this character; that public as distinguished from private interests are involved.

We concede that the Attorney-General, ex-officio, exercises his own discretion, and, without leave of court, has the right at any time to file in the Supreme Court an information in quo warranto wherein matters of public interest are involved, but that he can not maintain such a proceeding solely for the vindication of private rights, or the redress of private grievances, in which the public has no interest, we think clear; and if these facts appear from the information, they may be taken advantage of by return or special plea to the order to show cause.

The chief grounds of complaint are those affecting the rights of certain grain dealers in Kansas City, and certain railroad companies whose termini are at that city who deny the right of defendant to make a particular charge, called a "reconsignment charge," on grain and grain products made by four through lines of railroad, for a service actually rendered, after delivering the grain upon certain tracks, known as "hold tracks," which said service has been performed gratuitously prior to July 28, 1902, and which said charge absorbed

or was refunded in the event of reshipment out of said city over any of said four lines of road.

We are unable to see wherein the public has any interest in the "reconsignment charge," which is paid solely by certain grain dealers and railroads whose western termini are at Kansas City for an additional service not covered by the freight into that city, and which they have the right to charge, provided it be nothing more than what is reasonable for the services rendered.

In Spelling on Injunctions and Other Extraordinary Remedies (2 Ed.), section 1773, it is said:

"It has been stated that quo warranto originated as a prerogative remedy, and has always retained the character as a judicial means for the assertion of sovereign right. It is, and always was a mandate issuing from or at the instance of the sovereign against an individual or corporation, requiring him or it to show, quo warranto, by what warrant or authority an office or franchise is claimed or exercised. That feature adheres to it in all cases, even where the interest of the relator seems to outweigh any public interest in the question at issue, as where it is resorted to to test the title to an office between two claimants; for while the public may not have any interest in the question whether A. or B. shall perform the duties and enjoy the emoluments of a public office, still it has an interest that neither A. nor B. shall usurp a public office. And the same reasoning applies where title to an office in a private corporation is in dispute, since such controversy usually involves the further question of whether a corporate franchise has or has not been usurped. Hence quo warranto will not issue merely for the determination of a private right where the whole community are not interested. Parties must be their own judges as to suits they will institute to have their private rights determined, and these must be tried and adjudicated upon

their own merits, where no general public interests are affected.''

Later on, in section 1830 of the same volume, it is said:

''The people of the State have no power to invoke the action of the courts of justice in this form for the redress of civil wrongs sustained by some citizens at the hands of others. When the people come into court in the name and right of sovereignty, as plaintiffs in a civil action, they must come upon their own right for relief, to which they are themselves entitled. It is not sufficient for them to show that wrong has been done to some one; the wrong must appear to be done to the public, in order to support an action by the people for redress. This principle has been applied and illustrated in numerous cases, both in England and the United States. Thus, where a turnpike company, in making the road through private lands, had failed to compensate the owners according to the direction of the act, it was held that the company was merely a trespasser, and that the fact that the public was in no way interested in such controversy was a sufficient reason for not granting an information in the nature of quo warranto. In such case it is plain that entering and injuring lands of private parties is neither an abuse nor an assumption of corporate power, but a simple violation of private right. A provision of the company's charter, requiring it to do certain things before entering on lands, is inserted, not for public but for private security. By entering without complying, the company was simply guilty of a tort, as its trespassing agents would have been if no charter had been granted.''

In Beach on Private Corporations, vol. 1, sec. 58, it is said:

''Something more than non-user, accidental negligence, excess of corporate power, . . . is requisite to constitute a cause of forfeiture. There must be some willful or improper act or neglect, such as to work

or threaten a substantial injury to the public, or actual inability to perform some corporate obligation, or an entire non-user of its powers and privileges for such a time as to create a presumption of surrender. The transgression must not be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare. For the State does not concern itself with the quarrels of private litigants. It furnishes for them sufficient courts and remedies, but intervenes as a party only where some public interest requires its action. Corporations may and often do exceed their authority where only private rights are affected. When these are adjusted all mischief ends and all harm is averted.''

In State ex rel. v. Meek, 129 Mo. 436, the court says: ''The primary and fundamental question in a proceeding by quo warranto is whether the defendant is legally entitled to hold the office, and not as to the rights of any person who may claim it.''

In Ramsey v. Carhart, 27 Ark. 12, the syllabus is as follows: ''The writ of quo warranto will only issue in the name of the State in cases where the whole community are interested, and will not be granted at the instance of an individual for the determination of a private right.''

The court says:

''The only question is, whether a quo warranto will issue on the relation of a private person? It was held, in State v. Ashley, 1 Ark. 279; Caldwell v. Bell and Graham, 6 Ark. 227, and State v. Williams, that the writ of quo warranto would only issue on the relation of the Attorney-General, in the name of the State, in cases where the whole community are interested, and would not be granted at the instance of an individual for the determination of a private right. . . . Quo warranto was invented, originally, not to determine which of two persons was entitled to an office, but to require the incumbent to show by what authority he was

exercising or attempting to exercise the duties of an office, created by sovereign authority. The issue was between the State and the person in office; and not between two persons who claimed the right to exercise its duties. In short, quo warranto is the right of the State, and only issues at the instance of the State. It was not, nor is it now designed or used as a remedy, at law, by which individuals may contest the right to an office. The Legislature has provided a separate remedy for the determination of such a question, and the parties must seek the remedies provided for them, instead of one provided for the State."

In Cupit v. Bank, 20 Utah 293, the court says: "It is well setttled by abundant authority that the writ will not issue and can not be invoked for the purpose of determining merely a private right, in which the public is not interested."

To the same effect are People ex rel. v. Cooper, 139 Ill. 461; People ex rel. v. Bridge Co., 13 Colo. 11; State ex rel. v. Railroad, 50 Ohio St. 239; Territory v. Virginia Road Co., 2 Mont. 104; People ex rel. v. Railroad, 8 Colo. App. 301; Attorney-General v. Railroad, 96 Mich. 65; Attorney-General v. Salem, 103 Mass. 138; People v. Drainage Commissioners, 31 Ill. App. 219; Reagan v. Loan & Trust Co., 154 U. S. 362.

Quo warranto is not a remedy to determine disputes between private persons and a corporation, but is to determine by what right a corporation exercises wrongfully or illegally a certain franchise, or to oust it from the right to be a corporation, for an abuse or non-user of franchises granted. In a word, it will only lie against a corporation for some violation of its charter. But it is claimed by the Attorney-General that sections 1113, 1114 and 1115, Revised Statutes 1899, require delivery by the initial carrier of freight upon any track it owns, leases, or uses, or can use, and that the enforcement of that statute necessarily deprives the railroad companies of this right to assess and collect the recon-

signment charges described in the information. We are unable to concur in the view that because the statute imposes additional duties upon initial carriers to those incurred by contract, express or implied, therefore it in anyway deprives the railroad companies of the right to assess and collect a reasonable compensation for such extra work. There is nothing in the express terms of the statute requiring a free delivery to elevators, or elsewhere, after being placed on the "hold tracks," nor can such duty be implied from the language used. Nor do we believe the Legislature so intended; otherwise, it would have so indicated. Our conclusion is that mere private rights are invoked in this proceeding, and that quo warranto will not lie.

Nor will quo warranto lie for the violation of an alleged custom of gratuitously performing the services for which the reconsignment charge is now made. No legal right can be predicated upon such a custom. Usages and customs may be useful in the interpretation of a contract which was made with respect thereto, but can not be held to create them. [27 Am. and Eng. Ency. of Law, 712; Ulmer v. Favorworth, 80 Me. 500.] "Usage can not make a contract where there is none." [National Bank v. Burkhardt, 100 U. S. 692; Tilley. v. County of Cook, 103 U. S. 155.]

It must be obvious to anyone that the charges in question are made with reference to interstate commerce, for as long as the loaded car remains in the custody of the initial carrier, and until it is finally delivered to the consignee or forwarded to its final destination upon his order, after being placed upon the "hold tracks," any further movement of the car would be a part of the interstate transportation, charges for which service are fully covered by the interstate commerce law.

Section 1 of that law provides that the provisions thereof shall apply to any common carrier engaged in the transportation of passengers or property wholly

by railroad, or partly by railroad and partly by water, when both are used under a common control, management or arrangement, for a continuous carriage or shipment from one State or Territory of the United States . . . to any other State or Territory. It also contains the following provision:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property, as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

Section 2 prohibits unjust discrimination as between shippers in the making of charges for any service rendered in the transportation of a like kind of traffic under substantially similar circumstances and conditions.

Section 3 prohibits the making or giving of any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic.

Section 6 provides for the establishment, printing and posting of schedules of rates in force at the time upon its route, which schedules shall plainly state the places upon its railroad between which property and passengers will be carried, and "also state separately the terminal charges and any rulings or regulations which in anywise change, affect or determine any part of the aggregate of such aforesaid rates, fares and charges."

It will thus be seen that any and all services incidental or necessary to the transportation and final delivery of the shipment, is a part of the interstate transportation, and that charges therefor are regulated by the Interstate Commerce Act.

Section 8 provides that for any violation of the act the common carrier "shall be liable to the person or

persons injured thereby, for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court.''

Section 9 provides ''that any person or persons claiming to be damaged by any common carrier, subject to the provisions of this act, may either make complaint to the commission, as hereinafter provided, or bring suit in his or their own behalf, for the recovery of the damages for which such common carrier may be liable, under the provisions of this act, in any district court or circuit court of the United States of competent jurisdiction, but such person or persons shall not have the right to pursue both of said remedies, and must, in each case elect which one of the two methods of procedure herein provided for he or they will adopt.''

Other sections of the act furnish remedy by way of injunction in the circuit court of the United States, to the commission or any company or person interested in its order or requirement, against the continuance of violations of the act by a common carrier.

Further relief by way of injunction in the circuit court of the United States against violations of the act is afforded by virtue of section 3 of a recent act of Congress, approved February 19, 1903, entitled, ''An Act to further regulate commerce with foreign nations and among the States.''

That the validity of all charges for services rendered in connection with interstate transportation is vested exclusively in the Interstate Commerce Commission and the courts of the United States, is well settled.    In the case of Covington & Cincinnati Bridge Co. v. Kentucky, 154 U. S. 204, the State of Kentucky passed an act providing that it should be unlawful for the bridge company to charge, collect, demand or receive for passage over the bridge spanning the Ohio river, any toll, fare or compensation greater or in excess of certain rates prescribed by the act, which were

much less than the directors had fixed. The court held that the traffic across the river was interstate commerce; that the bridge was an instrument of such commerce; that the statute was an attempted regulation of such commerce which the State had no constitutional power to make, and that Congress alone possessed the requisite power to enact a uniform scale of charges in such a case, the authority of the State being limited to fixing tolls on such channels of commerce as were exclusively within its territory.

So in Interstate Commerce Commission v. Railroad, 167 U. S. 633, it was said:

"It must be conceded that a state railroad corporation, when it engages as a common carrier in interstate commerce by making an arrangement for a continuous carriage or shipment of goods and merchandise, is subjected, so far as such traffic is concerned, to the regulations and provisions of the act of Congress. . . . So, likewise, it is settled that when a State statute and a Federal statute operate upon the same subject-matter and prescribe different rules concerning it, and the Federal statute is one within the competence of Congress to enact, the State statute must give way." [Rhodes v. Iowa, 170 U. S. 412; Gatton v. Railroad, 95 Iowa 112; Fielder v. Railroad, 42 S. W. 362; affirmed, 92 Tex. 176; Copp v. Railroad, 43 La. Ann. 511.]

It follows from what has been said that no common carrier doing an interstate business derives its right to charge tolls or fares for interstate transportation, or for services therefor or in connection therewith, from the State, but from the Federal Government, hence the State has no power or authority to forfeit such right or franchise or to oust any such common carrier from the exercise of any such right.

But even if the matter under consideration is not interstate (which we do not concede) and the State alone possesses the requisite power to regulate the charge in question, will quo warranto lie to control the

defendant company in making, charging and collecting rates for transportation and for charges for services rendered in connection therewith? The Legislature has made ample provisions for the regulation of transportation charges by railroads and prohibiting discriminations. [Arts. 2 and 4, ch. 12, R. S. 1899.] Unjust and unreasonable rates and charges, discrimination under advantages and preference, and, in fact, the entire subject-matter of transportation wholly within this State, are fully covered, remedies provided and penalties imposed. By the article last named a state railroad commission, some of the power and duties of which are provided for by said article 2, is also given the right to appeal to the courts of this State for assistance in the enforcement of its orders. By these statutes if any private individual sustains damages by reason of any fault of a railroad common carrier, he is afforded ample redress by resort to the State courts or by complaint to the Railroad Commission. These statutes having been enacted in pursuance of the Constitution, the remedies therein pointed out for redress for damages sustained is exclusive, and it is therefore not within the jurisdiction of this court to entertain quo warranto against defendant on account of any such matter.

In State ex rel. v. Francis, 88 Mo. 557, it is said:

"When the General Assembly, in obedience to the constitutional mandate, designates, by general law, the court, or courts, or judge, by whom election contests shall be tried, and regulates the manner of trial, and all incidents thereto, from that moment the jurisdiction of courts, or judges, not thus designated, ceases, if they possessed it before, and the courts to which the jurisdiction is confided must exercise it as prescribed by law." [State ex rel. Attorney-General v. Mason, 77 Mo. 189; State ex rel. v. Vail, 53 Mo. 97; Commonwealth ex rel. v. Garrigues, 28 Pa. St. 9; Commonwealth ex rel. v. Henszey, 81½ Pa. St. 101; Baker v.

Railroad, 36 Mo. 544; Soulard v. City, 36 Mo. 546; Railroad v. Railroad, 149 Mo. 245; Young v. Railroad, 33 Mo. App. 509; State ex rel. v. Marlow, 15 Ohio St. 114.]

In Winsor Coal Co. v. Railroad, 52 Fed. 716, it is said:

"The right of action existing at common law in favor of the shipper for extortionate charges was superseded by the remedies provided by the statute. . . . Throughout the entire act it is clear that it was the legislative mind to impose upon the chosen agents of the State—the railroad commissioners—the duty of supervising and regulating the rates charged by such carriers, and to ascertain and declare, from time to time, as the changing conditions of trade and commerce might suggest, what, as between shipper and carrier, is a reasonable and just rate of compensation. In the absence of any affirmative action by the commissioners, the Legislature declares a maximum rate, and the carrier is to make and keep public a schedule within this maximum. The railroad commissioners may revise it, if deemed right and just to do so; and the rates thus fixed are to be observed by the carrier until changed conformably to the statute. The statute expressly declares it to be unlawful for the carrier to exact a greater or less rate than that so scheduled. In the absence of any affirmative action by the commissioners, the intendment of law arising from the legal presumption that public officers perform their duties should be that no complaint had arisen of unjust charges, or that the commissioners, who are presumed to be in possession of the schedule adopted by the carrier, deemed the maximum fixed by the carrier and the Legislature to be reasonable and just. . . . A right of action in favor of the shipper, it may be conceded, existed at common law for extortionate charges, but the statute has superseded the common-law remedy."

Our conclusion is that even if the reconsignment

charge be not interstate but within the control and under the jurisdiction of this State, quo warranto will not lie to control the defendant in making, charging and collecting rates for transportation and charges for services rendered in connection therewith.

Nor do we think the information shows such a state of facts as would, from any standpoint of view, authorize the issuance of the writ of ouster.

The plea to the information will be sustained and writ quashed. It is so ordered.

All concur.